W. E. ERICKSON CONSTRUCTION, INC., *et al.*, Plaintiffs-Appellees, *v.* CONGRESS-KENILWORTH CORPORATION *et al.*, Defendants-Appellants.

First District (4th Division)   No. 82—1488

Opinion filed February 3, 1983.—Rehearing denied March 17, 1983.

Nathan Diamond-Falk, of Chicago, for appellants.

Tatel & Howlett, P.C., of Chicago, for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

This is an interlocutory appeal from an order appointing a receiver of a corporation that operates a water slide as an amusement business. The defendants, Congress-Kenilworth Corporation, James Adams and John Stafford (collectively Congress-Kenilworth) claim that the trial court was in error when it appointed a receiver on the petition of the plaintiffs, W. E. Erickson Company, Inc., and W. E. Erickson (collectively Erickson).

Erickson filed an action seeking a money judgment for breach of a construction contract. It also sought to impose a constructive trust on the defendants' interest in the real estate and during the litigation

requested that a receiver be appointed or that injunctive relief be granted. The complaint alleged that "Plaintiffs ERICKSON CONSTRUCTION and ERICKSON *fear* that said monies generated by the project *will be diverted* \*\*\*." (Emphasis added.) No underlying facts were alleged. This allegation and the finding on the issue are the focal point of this appeal.

The facts relating to Erickson's alleged fear of diversion were adduced at a four-day evidentiary hearing before the trial court which began on May 26, 1982. The evidence showed that Erickson, a general contractor, was hired to construct a public amusement consisting of a concrete water slide for Congress-Kenilworth for a total cost not to exceed $535,000. Work commenced on April 15, 1981. The contract provided that Erickson was to apply for monthly progress payments and that Congress-Kenilworth was required to pay Erickson within 30 days of application. On June 16, 1981, when the project was 60% completed, Erickson applied for a payment in the amount of $246,958, which it did not receive. Since Congress-Kenilworth was seeking financing, the parties then agreed that Congress-Kenilworth would deliver the deed to the real estate to Erickson and that Erickson would use this deed as security for additional interim financing. Congress-Kenilworth's stockholders' resolution of June 20, 1981, authorizing this deed stated that the assignment was made to guarantee payment of the indebtedness owed to the plaintiff and to ensure payment and completion of the project for opening on July 3, 1981. The title was placed in a land trust and the beneficial interest was assigned to Elmhurst National Bank as additional security for financing obtained by Erickson.

The season for the use of the water slide runs from approximately the 4th of July to Labor Day. The project was opened to the public on the 4th of July. On July 9, 1981, Adams, Stafford and their attorney, Paul Daugerdas, the three principal stockholders of Congress-Kenilworth, filed articles of incorporation for a separate corporation to be known as Thunder Mountain Rapids Corporation. The designated purposes of Thunder Mountain Rapids Corporation were identical to those set forth in the articles of incorporation of Congress-Kenilworth. In addition, all bank accounts standing in the name of Congress-Kenilworth were closed; all gross revenues were collected by Thunder Mountain Rapids and deposited in its accounts; and a written management contract was entered into between Congress-Kenilworth and Thunder Mountain Rapids. The contract was requested but not produced at trial. There is no further evidence in the record as to the terms of the contract. The record also reveals that Thunder Mountain

Rapids owns 80% of Congress-Kenilworth and a church owns the other 20%.

Because no subsequent arrangements had been made to pay Erickson, a meeting between the parties was held on July 14, 1981. A letter drafted by Congress-Kenilworth's attorney acknowledged Congress-Kenilworth's indebtedness to Erickson in the amount of $550,000 and informed Erickson that "within 30 days or less we expect to pay you in full." The letter enclosed a partial payment in the amount of $50,000. Another payment of $85,000 was made to Erickson on August 20, 1981. Both payments were made by Thunder Mountain Rapids Corporation. It is not clear from the record but all of the parties accept the fact that Erickson was paid an additional $15,000 bringing the total paid on its contract to $150,000.

It is at this juncture that an unusual event occurred. Sometime in August, 1981, the parties learned that the Department of the Army owned the real property conveyed by Congress-Kenilworth to Erickson and that the water slide was an encroachment. Congress-Kenilworth subsequently entered into a lease with the Army.

At the hearing, Erickson's evidence further established that the gross revenues of the project in 1981 were approximately $224,000. It was stipulated that the books and records of Congress-Kenilworth, which were available to Erickson, correctly reflected the results of the operation. At the time of the hearing, there was nothing remaining of the income from the 1981 operation which concluded on Labor Day of 1981. The 1982 season was just beginning. According to the defendants' evidence, which was undisputed, the revenue from the slide was given to Erickson. Also, Adams testified that he and Stafford did not take a salary but were reimbursed a total of $25,000 for expenses which they had incurred before the slide was opened. This evidence was also undisputed.

At the conclusion of the hearing, the court took the matter under advisement and several days later read its decision into the record. The court appointed a receiver after finding that the security given to Erickson, the deed to the real estate, was worthless; that the future proceeds from the slide constituted a special fund; and that hundreds of thousands of dollars were passing through Thunder Mountain Rapids Corporation while Congress-Kenilworth alleged that they could not pay because they did not have any assets. The court made no findings specifically relating to diversion, malfeasance or misfeasance on the part of the defendants.

The facts related above must be measured against the stringent legal requirements for the appointment of a receiver and the rationale

for such stringency. The requirements are set out in *Bagdonas v. Liberty Land & Investment Co.* (1923), 309 Ill. 103, 110, 140 N.E. 49, 52:

"Application for the appointment of a receiver is addressed to the sound legal discretion of the court. It is a high and extraordinary remedy. The power is not arbitrary and should be exercised with caution and only where the court is satisfied there is imminent danger of loss if it is not exercised. The general rule is that the applicant must show, first, that he has a clear right to the property itself or has some lien upon it, or that the property constitutes *a special fund* to which he has a right to resort for the satisfaction of his claim; and, second, that the possession of the property by the defendant was obtained by fraud, or that the property itself, or *the income arising from it, is in danger of loss from neglect, waste, misconduct or insolvency.*" (Emphasis added.)

The rationale as to why a court should only sparingly apply the remedy of a receiver is also enunciated by the supreme court in *Bagdonas.* The court stated that one of the rights of ownership of property is possession. Thus when a court exercises its equitable powers and appoints a receiver, it deprives the legal owner of possession. Such an exercise of power is in derogation of the owner's right to possession. Consequently, the court should only exercise its discretion and appoint a receiver "when the necessity therefor [*sic*] clearly appears." 309 Ill. 103, 111, 140 N.E. 49, 52.

■ Under *Bagdonas,* as applied in the instant case, there are two requisites for the imposition of a receiver. Erickson had to first prove that there was a special fund. We believe that this requirement was met when Erickson presented evidence to show that it was given a warranty deed as security for additional financing. When this security failed, the court could properly impose an equitable lien on behalf of Erickson because there existed a mutual mistake as to the validity of the deed. Mutual mistake involving improvements on the land of another is a basis for the imposition of an equitable lien. (See *Stegeman v. Smith* (1966), 67 Ill. App. 2d 451, 214 N.E.2d 597; *In re Estate of Holder* (1976), 42 Ill. App. 3d 35, 355 N.E.2d 333; Restatement of Restitution sec. 170 (1937).) Thus the equitable lien served as the source for the creation of a special fund.

The second requirement for the extraordinary remedy of the appointment of the receiver is that the income arising from the special fund is in danger of loss from neglect, waste, misconduct or insolvency. To comport with this requirement, the plaintiff alleges a fear of diversion. We believe the evidence does not support the necessary

showing to meet the second requirement.

At the hearing, Erickson established the following facts. By way of stipulation, it established that the books and records of the defendants correctly reflected the results of the operation of the business. It established that the books and records showed an income of approximately $224,000 and that Erickson received a payment of $150,000 out of this income. Of the $150,000 payment to Erickson, $135,000 came directly from Thunder Mountain Rapids Corporation. In addition, Erickson neither argued nor attempted to prove that the management agreement could be considered the source of a fear of diversion. The simple fact that such an agreement existed was not sufficient evidence to support such an inference. Because Erickson did not inquire into the reasons for the establishment of the management agreement in the hearing, there is no evidence in the record to support an inference that the management agreement was forged for nefarious purposes or to support an inference that Erickson was, or would be, deprived of any proceeds because of the agreement. Therefore, all that Erickson was able to show at the hearing is what it had alleged in its complaint. Erickson had a speculative fear that the money would be diverted. A speculative fear is not legally sufficient to support the drastic remedy of the appointment of a receiver.

For the above reasons, we reverse and remand the decision of the trial court.

Reversed and remanded.

ROMITI, P.J., and JOHNSON, J., concur.