# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

### *Dedic v. Board of North Shore Towers Condominium Ass'n*,
### 2018 IL App (1st) 171842

</div>

| | |
|---|---|
| Appellate Court Caption | SELMA DEDIC, Plaintiff-Appellant, v. BOARD OF NORTH SHORE TOWERS CONDOMINIUM ASSOCIATION, Defendant-Appellee. |
| District & No. | First District, Fourth Division <br> Docket No. 1-17-1842 |
| Rule 23 order filed <br> Motion to publish allowed <br> Opinion filed | March 29, 2018 <br><br> April 24, 2018 <br> May 17, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-14099; the Hon. Diane Joan Larsen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard D. Grossman, of Chicago, for appellant. <br><br> Kevin M. O'Hagan, James W. Davidson, and Sean G. Rohan, of O'Hagan Meyer LLC, of Chicago, for appellee. |

Panel          JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1          Condominium unit owner Selma Dedic sought a permanent injunction to prevent the board of managers of North Shore Towers Condominium Association (Board) from levying a $1.01 million special assessment to remediate all 90 balconies in her residential condominium complex in Skokie, Illinois, and from executing a contract to perform the work.[1] Dedic contended the Board could not proceed until it held a referendum vote of the unit owners. The community's declaration of condominium ownership and the Condominium Property Act (Act) provide that the imposition of a special assessment of this magnitude may be nullified by an owner referendum. 765 ILCS 605/18(a)(8)(ii) (West 2014) (20% of condominium association members may demand a referendum of a large special assessment, and unless a majority of voters reject the assessment, it is ratified). However, regardless of the size of a special assessment, if it addresses an "emergenc[y]" or is "mandated by law," then owners are not entitled to vote. 765 ILCS 605/18(a)(8)(ii), (iv) (West 2014). It is undisputed that Dedic's balcony, situated within an interior courtyard of the 40-year-old condominium complex, had not deteriorated to the extent that it posed an imminent safety concern to her. After a two-day bench trial, the circuit court judge found that the railings of 56 of the 90 balconies could not withstand the 200-pound minimum point load required by local building code and, thus, remediation was an "emergency" and was also "mandated by law." On appeal, Dedic contends the evidence showed that only a handful of the balconies actually presented an immediate danger, that a general refurbishment of the balconies may be prudent and a sign of good property management but is not an "emergency," and that, until the Board undertook "extensive repairs," it would not be "mandated by law" to retrofit or replace the balcony railings so that their height and spindle spacing conformed with a new or updated building code.

¶ 2          The Board adopted the special assessment on September 21, 2016, based on competitive bids, which had been received in June and August 2016, and the Board intended to proceed with immediate repairs of the most critical balconies before the arrival of winter weather. However, Dedic and 21 other unit owners petitioned the Board on October 4, 2016, to hold a referendum. Section 14(g) of the North Shore Towers condominium association declaration of condominium ownership allows unit owners to call a referendum vote on any special assessment passed by the Board that exceeds 115% of the sum of the prior year's regular and special assessments. That section states:

          "(g) Special Assessment. The Board may levy a special assessment (1) to pay (or to build up reserves to pay) extraordinary expenses incurred (or to be incurred) by the

_____

[1]Dedic has consistently omitted the word "Towers" when referring to the Board, the condominium association, and the condominium complex. We have used the names that appear in the condominium declaration.

Association for a specific purpose including, without limitation, to make additions, alterations or improvements to the Common Elements, *** or (4) to cover the cost of an emergency. Any special assessment, which will require the aggregate payment with respect to a Unit which results in a sum or all regular separate assessments payable in the current fiscal year exceeding 115% of the sum of all regular and special assessments payable during the preceding fiscal year, the Board, upon written petition of the Unit Owners with twenty percent (20%) of the votes of the Association delivered to the Board within fourteen (14) days of the Board action, shall call a meeting of the Unit Owners within thirty (30) days of the date of delivery of the petition to consider the special assessment; unless a majority of the total votes of the Unit Owners are cast at the meeting to reject the special assessment, it is ratified. *Special assessments related to emergencies or mandated by law may be adopted by the Board without Unit Owner approval and will not be subject to the Unit Owners' right to petition as mentioned above.* Each Owner shall be responsible for the payment of the amount of the special assessment multiplied by the Unit's Undivided Interest [in the Common Elements appurtenant to a Unit as allocated in the original Declaration]." (Emphasis added.)

¶ 3    Section 14(h) of the declaration further addresses emergency special assessments and defines the term "emergency," stating:

"(h) Emergencies. The Board may levy a special assessment for expenditures related to emergencies or mandated by law, without being subject to Unit Owner approval of [or] the Unit Owners' right to petition as mentioned in section (g) above. An emergency is defined as an immediate danger to the structural integrity of the Common Elements or to the life, health, safety or property of the Unit Owners."

¶ 4    These provisions are consistent with the Act's general rules concerning the minimum content of condominium bylaws. Section 18(a)(8) of the Act stated in relevant part:

"(ii) that except as provided in subsection (iv) below, if an adopted budget or any separate assessment adopted by the board would result in the sum of all regular and separate assessments payable in the current fiscal year exceeding 115% of the sum of all regular and separate assessments payable during the preceding fiscal year, the board of managers, upon written petition by unit owners with 20 percent of the votes of the association delivered to the board within 14 days of the board action, shall call a meeting of the unit owners within 30 days of the date of delivery of the petition to consider the budget or separate assessment; unless a majority of the total votes of the unit owners are cast at the meeting to reject the budget or separate assessment, it is ratified, *** (iv) that *separate assessments for expenditures relating to emergencies or mandated by law may be adopted by the board of managers without being subject to unit owner approval* or the provisions of item (ii) above or item (v) below. As used herein, *'emergency' means an immediate danger to the structural integrity of the common elements or to the life, health, safety or property of the unit owners* ***[.]*" (Emphases added.) 765 ILCS 605/18(a)(8)(ii), (iv) (West 2014).

¶ 5    The Board declined to schedule a unit owners' vote. Attorney Kerry T. Bartell, who specializes in Illinois community association law, sent Dedic an explanatory letter, stating in part:

"It is the opinion of [the licensed, independent structural engineering firm engaged by the Board] that a number of the balconies are unsafe for use by the homeowners, and

[this law firm] understand[s] that the Board has already advised those owners to refrain from using them until the repairs can be completed. This is an immediate life and safety hazard for the property and we understand it affects many of the balconies. Pursuant to the Act, this is an emergency repair and therefore, the petition that you submitted is ineffective and not appropriate. Accordingly, the Board will not be calling a meeting of the owners to vote on the rejection of the special assessment since this remedy is not available to you at this time."

¶ 6        On October 27, 2016, Dedic filed, in Cook County circuit court, her two-count complaint for preliminary and permanent injunctive relief in which she alleged that the Board violated both the condominium declaration and the Act because "approximately 96% of the contemplated work is not required to be, nor is it, 'immediate' " and it does not constitute an "emergency." Dedic further alleged she had been deprived of "a 'due process' or voting right" under the condominium declaration and the Act. She asked the court to prevent the implementation of the special assessment until a unit owner referendum had been conducted and to prevent the Board from entering into any contract to repair, replace, or perform work on balconies not in need of immediate repair. After the Board filed an answer denying the material allegations, the parties abbreviated their discovery and filed stipulated facts and joint trial exhibits to be used at the hearing on Dedic's motion for a preliminary injunction. There was no dispute over the qualifications of the opposing structural engineering experts, and the joint exhibits included the engineers' reports and deposition transcripts. When the hearing began, Dedic proposed that her motion be treated as one for a permanent, rather than preliminary, injunction, and with the Board's agreement, the judge ruled that Dedic would be held to the higher standard of proving the merits of her claim. We will set out the undisputed facts before summarizing the trial testimony and the court's ruling.

¶ 7        North Shore Towers is a 90-unit, residential condominium development in Skokie, consisting of two, six-story buildings. The property is situated at the intersection of Gross Point Road and Golf Road, and the buildings' addresses are 9558 and 9560 Gross Point Road. The complex was developed in 1979, and the buildings were nearing 40 years of age in early 2015 when the Board received complaints about the condition of certain balconies. Each condo has two or three bedrooms and an appurtenant balcony. The balconies each measure approximately 23 feet by 5 feet, with some variation among the units, and they are considered limited common elements of the property.

¶ 8        The condominium declaration and Act require the Board to provide for the operation, care, upkeep, maintenance, replacement, and improvement of the common elements. 765 ILCS 605/18.4(a) (West 2014). The Board may levy and spend special assessments to pay for the common benefit of all the owners. 765 ILCS 605/18.4(c) (West 2014). The members and officers of the Board must exercise due care in the exercise of their duties and are held to be fiduciaries to the unit owners. 765 ILCS 605/18.4 (West 2014).

¶ 9        In the spring of 2015, the Board retained the engineering and architectural firm of Wiss, Janney, Elstner Associates, Inc., to evaluate the condition of the aging balconies. Licensed structural engineer Tracy R. Naso, who is an associate principal and project manager at the engineering firm, supervised the project and authored a report dated July 14, 2015, setting out the firm's observations and recommendations.

¶ 10       Naso's report indicated that she earned a bachelor of science degree in civil engineering from the University of Kentucky in 2003 and a master of science in structural engineering from

the University of Illinois at Urbana-Champaign in 2004. Naso "specializes in the investigation and repair of reinforced concrete structures, including conventional, post-tensioned, prestressed, and antiquated systems" and has experience with "tunnels, parking structures, plazas, stadiums, pools, and highrise towers." Naso also "designs structural repairs for the remediation and strengthening of new and existing structures, develops construction documents, and provides construction period observation and administration services for the implementation of repair designs."

¶ 11 Naso documented that her firm's inspections at North Shore Towers had begun in response to the reports of four unit owners regarding the condition of their balcony floors or handrails. In April and May 2015, Naso and her team of engineers completed a "close-up" inspection of units 407B, 505B, 602B, and 603B in the 9560 Gross Point Road building and used binoculars to conduct "a visual review from grade" of all the balconies in both condo buildings. Naso, who had experience in this type of evaluation, averred that "[v]isual inspection of balconies from the ground, using binoculars, is a customary method used in the industry to assess structures like North Shore Towers' balconies."

¶ 12 After the report and passage of the special assessment, additional owners asked for closer inspections of their balconies. In November 2015, one of Naso's team members, Dick Arnold, returned to the site and stood on and inspected an additional 39 balconies. Naso did not prepare a second written report but was in communication with the Board and also attended some board meetings during this time frame regarding how to best address the identified problems. Naso subsequently completed an affidavit dated March 3, 2017, in connection with this litigation.

¶ 13 In her July 2015 report, Naso described the balcony construction as corrugated steel decking, which was supported on floor joists that cantilevered out from the building structure. A steel channel had been installed around the perimeter edge of each balcony, and the steel pan was then filled with concrete. The concrete and steel base was shielded by a green waterproofing membrane, which covered the top of the balcony and had a short return up the exterior of the building's masonry veneer. Six steel posts had been welded into the steel channel installed around the perimeter of the balcony, and then six vertical anchors were fitted over the posts and secured with screws. From there, a prefabricated aluminum railing was anchored by screws into the six vertical posts and into the masonry. The top height of the rails was 41 inches, with a 4-inch gap between the top of the balcony slab and the bottom rail. The vertical spindles were spaced 6 inches apart.

¶ 14 Naso documented bubbling, peeling, lifting, and cracking in the waterproofing membranes of the four balconies that had prompted the investigation and been available for "close-up investigation." She indicated that, once water penetrated beneath the membrane, it became trapped, the long-term exposure to moisture caused the steel edge channel to corrode, built-up rust caused the edge channel to rotate outward, and the attached hand railing then also rotated outward. In addition, the trapped water saturated the concrete infill and damaged it through cyclic freezing and thawing.

¶ 15 With regard to the 86 balconies that been inspected from the ground level, Naso documented that some had visible corrosion, extensive damage to the handrail bases, and outward displacement of the railings. The corrosion and "[e]xtensive damage" that occurred to the bases of the handrail posts was "typical for the balconies along Gross Point Road," although Naso did not specify how many balconies were on Gross Point Road. "At these

- 5 -

locations, the aluminum was split vertically along the corners of the bases of the posts, and both dark red and white corrosion byproducts were visible" from the ground. The red corrosion was from the steel base, and the white corrosion was from the aluminum railing. Naso noted visible handrail displacement in 23 balconies along Gross Point Road, one handrail that was detached from the exterior masonry, and one handrail with a separated joint. Thus, some but not all 90 balconies had defects.

¶ 16 In order to remediate the balcony floors, Naso recommended removing the unsound concrete; cleaning and inspecting the steel decking; making repairs to the steel decking, edge channel, and their welded connections; coating the exposed steel surfaces with corrosion-inhibiting paint; restoring the concrete infill; and, after adequate curing, applying flexible sealant between the steel edge channel and the concrete infill slab and finally reinstalling the waterproofing membrane. In order to remediate the issues with the railings, Naso recommended reinforcement or replacement of the posts, and she pointed out that reinforcement was a short-term solution that would not address the underlying corrosion and that it appeared the posts were part of modular system whose components could be replaced as needed. There was a potential, however, that the local building authority would insist on replacement of the handrails. The 41-inch top height of the existing handrails was slightly shorter than the 42 inches required by the current building code, and the 6-inch spacing between the spindles exceeded the maximum 4-inch spacing permitted by the current building code. If the building authority determined that the "repair [cost] exceeds a certain percentage of the replacement cost," then the authority might require retrofitting or replacing the handrails to conform with the current building code.

¶ 17 Finally, Naso noted, in addition to the observed deterioration in the concrete floors, steel posts, and aluminum railings, that in some instances, the only problem was that the "handrail connections" were visibly "loose or displaced" and "should be repaired as part of routine building maintenance."

¶ 18 Naso's written report was four, single-spaced pages and accompanied by numerous photographs of the identified issues. For instance, "Figure 1. Exposed structural framing on underside of balcony," "Figure 2. Failure of membrane at joint between steel edge channel and concrete," and "Figure 3. Pullout of anchors at top balcony railing."

¶ 19 Naso's deposition transcript indicates that in addition to her written report, she met with the Board to discuss the "repair documents," attended Board meetings regarding the problems, and exchanged e-mails with the property manager, instead of writing a second written report. Naso did not recommend multiple repair projects because the structural degradation was ongoing throughout the property and time and money would have to be spent each time a contractor assembled scaffolding. Although Naso stood on only four balconies in the spring of 2015, during a follow-up inspection in November 2015, one of the firm's engineers stood on and inspected an additional 39, for a total of 43 "close up" inspections. Naso's firm notified the Board that it should advise certain unit owners they should not use their balconies due to the "dangerous condition."

¶ 20 In her subsequent affidavit, Naso emphasized the severity of the problems that were observed in 2015 and the extent of her safety concerns in 2015. She summarized that a group of balconies "constitute unsafe conditions" and "require immediate repair" and another group of balconies are "less advanced" but "are also in immediate need of repair." In other words, it was her "professional opinion that North Shore Towers should begin balcony repair work

immediately." It was likely that none of the balconies highlighted in her 2015 report could "sustain the concentrated 200-pound load required by the building code" and that the balconies "pose a safety threat." The worst of the railings had detached from the building and could not "fulfill [the] intended purpose of preventing a fall." Naso also cautioned against the additional deflection (outward bowing) that could occur in the railings, such that "one could fall over the railing." The most cost-effective and fastest way to handle the structural degradation that had occurred or would occur at North Shore Towers was to address all of the balconies, regardless of their state of disrepair, in one project. This was largely due to the cost of assembling scaffolds to access the balconies and the efficiency that would occur by ordering materials and implementing the repairs through one contract, rather than in multiple projects. Multiple projects would be more expensive, would take longer, and were inadvisable because all of the balconies were of similar construction and the same age, the structural degradation was ongoing, and the rate of deterioration would increase over time. Naso further cautioned that her engineering firm had last inspected the balconies in November 2015 and that it was "very possible" that the degradation had worsened and also now encompassed additional balconies, due to passing of two winters, a spring, and a summer. Furthermore, the degradation would continue while North Shore Towers obtained permits, suffered delays or shutdowns due to inclement weather, including the onset of another winter, and completed a project that would require at least six months.

¶ 21     Dedic's structural engineer, Moshe Calamaro, completed a bachelor of science degree in 1976 at Technion, Israel Institute of Technology, in Haifa, Israel. Calamaro then gained experience as a structural design engineer while working for firms in the Chicago area until opening his own structural engineering office in Evanston, Illinois, in 1991. Calamaro offered his written opinion on the basis of his two site visits to North Shore Towers in March and April 2017 to "approximately 12" units, the observation of additional units from street level, and a review of Naso's report. During his deposition on April 19, 2017, Calamaro clarified that he stood on eight balconies and, from that vantage, he looked over to evaluate four adjacent balconies.

¶ 22     In his one-page letter to Dedic's attorney dated April 10, 2017, Calamaro indicated he agreed with Naso that the balconies suffered from "deficiencies with different degrees of severity," including problems with (1) the railings' horizontal top rail connection to the masonry building, (2) the railing posts' condition/connection to the balconies steel edge channel, and (3) the condition of the steel edge channels and the joint between the steel and concrete. Calamaro indicated he agreed with the proposed repair details, other than the scope of the concrete deck edge repair, "which is the most expensive part of the project." It was his opinion that the repair drawings that had been used to solicit competitive bids did not "directly address" damage to the rotated steel channels and that this issue "will add substantial costs that are not addressed in the bids."

¶ 23     During the April deposition, Calamaro made clear that he was tasked with inspecting specific balconies and that it was not his intention to examine every balcony at the development. At the conclusion of his letter to counsel, Calamaro indicated that on the basis of his "limited site visit," he concluded:

> "[N]one of the units that I have observed are in imminent condition of collapse or should be considered to require emergency repairs. After a full review of *all* the [balconies], a summary/list of the balconies that should not be used due to railing issues

or steel [channel] issues should be identified and be repaired on an expedited basis. The rest of the balconies should be identified for their required repairs and work should proceed as acceptable to the *** owners and as agreed with the contractors." (Emphasis in original.)

¶ 24 At his deposition, Calamaro acknowledged that he had not been retained to analyze whether any of the balconies were code-compliant, he had reached no opinion on the topic, and he "couldn't testify to a reasonable degree of structural engineering certainty whether or not the 12 balconies *** were compliant with any applicable codes." Thus, he had no opinion as to Naso's statement in paragraph 14 of her report: "The [56] balconies highlighted [in yellow and red marker on Exhibit C of her report] have a reduced capacity for a load carrying as described in the building code. In their current condition, these balcony railings would not likely be able to sustain the concentrated 200-pound load required by the building code. Therefore, they do not comply with the law and pose a safety threat." Calamaro agreed that if a balcony did not comply with a local or state building code, it should be brought into code compliance, in part to avoid fines or penalties, but Calamaro disagreed that this should be done "immediately." He agreed that he could render an opinion only as to the 12 balconies he had stood on or overlooked from an adjacent balcony. He conceded that the Naso "investigation and recommendations [were] much more detailed" than his.

¶ 25 In his opinion, a balcony's condition would be an "emergency" if its concrete slab were going to collapse, but it would not be an "emergency" if its railing could not withstand 200 pounds. "[I]f a railing won't withstand the required load, which is set forth in the building codes, you shouldn't use the balcony" because it is "dangerous [but only to someone using the balcony], and [he] would prohibit somebody from entering the balcony." Also, the "[railings] that had the deformity or bowing should be closely looked at," and Calamaro would "recommend to the owners not to use [the balcony in that condition]" and "to evaluate it and repair it." Under questioning by Dedic's attorney, Calamaro confirmed that the issues identified at North Shore Towers were "confined to the railings."

¶ 26 Dedic testified first at the trial. Dedic owns unit 208B with her husband. When the Dedics purchased the condominium in 2005, they had an inspector come out, and the inspection report did not make an issue of the balcony. In September 2016, she received notice of the special assessment and that her unit's share was $17,000. Dedic was "shocked" because after 12 years she had heard no complaints about the conditions of the balconies and because there was "nothing wrong with [her] balcony." Dedic did not know, at the time, that the Board had hired Naso's firm in 2015. The Board's meeting minutes for May 2016 indicate that Dedic was present and that the board discussed the need for balcony repairs and its receipt of four competitive bids, but Dedic did not recall hearing this discussion. Dedic and a neighbor solicited a petition to take a unit owner vote on the special assessment, and after obtaining signatures from more than 20% of the unit owners, Dedic gave the petition to the president of the condo board. At the next board meeting, the Board's lawyer, Bartell, said the special assessment was to cover an "emergency" and there would be no referendum. Karen Chou, the owner of unit 505A and a professor of structural engineering, was also there to answer questions. Chou said that her balcony was fine and was not one of the 56 balconies listed as not code-compliant but that Chou supported Naso's report and recommendations.

¶ 27 Dedic admitted that her intention was to vote down the special assessment regardless of what was in Naso's report and that Dedic filed suit without having a structural engineer review

the information. Dedic does not have an engineering background, and when asked how she could determine the accuracy of Naso's report without having an expert look at it, Dedic responded, "I know that [a] majority of the people in my building [do not] have problems, including me." According to Dedic, Naso "only inspected three to four [balconies] and then she made [the] determination [that all of the balconies should be addressed in a single project]." Dedic has since been elected to the Board and testified that to obtain answers regarding structural engineering, she would "probably research or hire somebody," specifically a structural engineer.

¶ 28    Judy Erlich has owned unit 405A since May 2005, became a Board member in 2013, and was reelected for another two-year term and chosen to be the Board president as of November 2015. Erlich testified that the "balcony issue started to surface" in 2014 when a few owners made complaints, starting with one owner who said her balcony was "in bad shape" and needed to be addressed so that she could move out the following year. Erlich could not recall how many owners came forward, but it was enough that the Board discussed it in "various Board meetings" and hired Naso's firm. Naso also attended "several" Board meetings. Board meetings were open to all unit members, but unless it was the annual general meeting or there was "an issue at hand," then maybe about only 30% of owners attended. When Naso determined the balconies had some serious issues, the Board agreed Naso should solicit bids from contractors based on the findings. The Board had the property manager call those unit owners whose balconies were an "emergency," and Erlich also spoke with other unit owners who asked about the situation. Erlich had "[m]any" conversations with Naso about the balconies. The Board invited the opinion of Karen Chou, a unit owner and professor of structural engineering at Northwestern University, whose balcony was fine and who would not have any apparent reason to support a project that addressed all of the balconies. The Board sought out Chou's review of the reports and the contractor bids because the Board was "shocked" by and skeptical of the bids. After Chou reviewed everything, she met with the Board and Naso to question every line item and "give [them] quite a cross-examination." Most of the Board did not understand the technical conversation between the engineers, but Chou and Naso came to an agreement that all the recommended work needed to be done. Erlich relied on the engineers' knowledge and recommendations about how to proceed. The Board discussed remediating only the worst balconies, but when the Board learned how many other balconies had degraded and would further erode over the years, the Board decided it made sense to address them all together. Erlich read the condominium declaration to mean that even a single balcony could result in an "emergency" special assessment. Three years earlier the Board had followed expert advice to "completely redo" the elevators in order to make them safe and bring them up to the current code, because that was the Board's practice, even if not cited for violations. When Erlich was asked "why somebody whose balcony is in perfect shape as far as you know is paying to have her balcony repaired," Erlich responded that neither she nor Dedic "know what to look for and whether or not there is a real issue" and that condominium association members "all share in the expenses of the entire building." When asked whether she had received an opinion on the percentage of the overall cost that was being incurred to address the 56 defective balconies, Erlich answered that Naso told her 85 to 90% of the total cost was to address those 56.

¶ 29    Calamaro testified consistently with his letter and deposition regarding the eight balconies he stood on and the four he inspected from an adjacent balcony. He did not consider the

condition of the balconies to be an "emergency" because they were not in imminent peril of collapse or falling off the building. He agreed that a balcony railing that would not support a 200-pound point load (or 50 pounds per foot) was "dangerous," that someone pushing on such a railing could fall off, and that such a balcony "shouldn't be used as a balcony." Naso did not cite a scientific analysis for her conclusion that the railings could not withstand a 200-pound point load. Calamaro had not determined whether the railings were capable of withstanding a 200-pound point load. He also agreed that all of the North Shore Towers balcony railings were out of code-compliance because of the inadequate railing height and spacing of the bars, but he said if the railings were not being repaired or worked on, the Board did not have to upgrade the railings to the code standards.

¶ 30 Dolores Orlove, who has owned unit 305A for 28 years, testified that she had attended "a board meeting" in the last year and did not recall any discussion of the balconies' structural integrity, she did not discuss the topic with "anyone from the board," and she did not "ever have a discussion with anyone regarding whether any of the balconies were code compliant."

¶ 31 At the conclusion of Orlove's testimony, Dedic rested her case, and the Board moved for a directed finding. The judge denied the Board's motion, and the trial continued.

¶ 32 Naso testified consistently with her report, affidavit, and deposition. Naso added that the waterproof membranes in use at North Shore Towers were to protect the structures, the waterproof membranes had a service life of 10 to 15 years, and the visible corrosion staining was an indication that "the deck is corroding [underneath the membrane]." When steel corrodes, the volume of rust can be up to 10 times greater than the volume of the original material, so there was a volumetric increase creating pressure, which caused some of the railings to bow outward. After Naso's written report to the Board in July 2015, 39 additional owners requested inspections, at which point, Naso's colleague, under her supervision, inspected those additional balconies in November 2015. Like Naso, he performed a visual inspection while standing on each of those 39 balconies and using a hammer to sound different surfaces for deterioration. The firm did not author a second formal written report at that point, but it did communicate to the Board and confirm that there was a systemic problem with a relatively large portion of the 90 balconies and that the firm was recommending that the Board proceed with repairs.

¶ 33 Although Naso identified only 56 balconies with inadequate railings, she disagreed with Dedic's contention that "nothing is wrong" with the other 34 balcony railings. All 90 balconies were the same age and construction and were susceptible to generally the same loads and forces that the firm observed during the inspections. While the 56 were the "worst," the 34 could have "ongoing deterioration that just hasn't manifested yet." This is because the waterproof coating that had been applied was "good practice" but there was "very little obvious maintenance" over the years and the product had not been recoated at the 10- or 15-year mark as it should have been. Naso said "based on our experience with the coatings *** we were seeing [cracks and corrosion staining which indicate] that [the coatings] were no longer effective," that water was accessing the steel components, causing corrosion which led to section loss, which in the extreme case is going to lead to structural failure. So the firm recommended that the Board begin repairing the 56 balconies that exhibited structural degradation and that, during the repair project, the firm access the remaining 34 balconies from the exterior, perform close-up inspections, and recommend any additional repairs that it found were necessary. The firm also recommended that the Board recoat all the balconies in order to

"significantly slow down" the number of balconies that would become hazardous in the near future. The firm made these recommendations based on the site inspections performed in the spring of 2015, November 2015, and the spring of 2016, meaning that the recommendation was already between a year and two years old and that the degradation was ongoing.

¶ 34 The balconies had not been cited for building code violations. The "issue" the firm identified was not the height or spacing of the railings as mandated under the modern building code but was "splitting and corrosion and section loss, that has reduced the inherent capacity" of the railings. "[I]n laymen's terms, it's not that these balconies are only 41 as opposed to 42 inches high, it's that if you lean on them they're going to break."

¶ 35 Nearly all of Naso's work involved investigating a reported problem, determining the cause, designing repairs, soliciting bids, and then following the repair project through to completion of the work. Because of the numerous balconies in the Chicago area, there are contractors that specialize in repairing balconies, and these were the contractors that Naso's firm recommended and solicited bids from for the North Shore Towers work. The chosen contractor would rig a suspended scaffold or swing stage from the roof in order to descend to the individual balconies without having to enter any of the owners' units. Naso or another representative of the firm would use this access in order to evaluate the actual condition of each balcony and then instruct the contractor to perform the individual corrections that were necessary. The contract had been written so that the contractor would be doing only the repairs that the firm identified through these further, individual balcony inspections. Every balcony would get new masonry connectors, deck recoating, and protective paint on the steel, but the structural repairs would be individualized. Remediating just the 56 worst balconies accounted for 80 to 85% of the total budgeted cost. Naso met with the Board and Chou to walk through the bids in detail and discuss the benefits and drawbacks of addressing only the 56 balconies. Naso projected that this approach would lead to another significant repair project within five years.

¶ 36 Naso attended two "town hall meetings" to answer questions posed by the unit owners. The "reception [at the first meeting] was a little hostile," there were "a lot of comments [from unit owners] that did not seem to be fully informed," and the evening was "chaotic." Relatively few questions were directed to the repair project itself; instead, there were "a lot of accusations" and the implication was that somehow the Board, the firm, or the contractor was personally benefitting from the project. Naso was not able to give full answers because of the many interruptions. It was "difficult to have a frank conversation with any of the owners" in that setting, and several had to come up after the meeting to get a full explanation. The second meeting was a little smaller and focused on the Board's decision and the amount of the special assessment.

¶ 37 Naso indicated her firm would earn 8 to 10% of the total cost of the project and that this range was "very typical for professional services" on this type of project. Naso denied that this fee was why she recommended doing preventative maintenance in addition to structural repairs. The winning bid was actually the result of Naso asking one of the contractors to review some of their specified costs and lower them if possible, which the contractor did.

¶ 38 Naso did not perform a physical load test to determine that the railings could not support 200 pounds of pressure because it was "obvious based on [her] experience and training that that element cannot support the required load" and she used "engineering judgment." Naso advised, and the Board followed through on, telling specific owners and "some" additional

owners who subsequently reported deterioration to not use their balconies. The other 53 balconies presented a problem if someone tripped and fell against the railing because the railing might not be capable of restraining them from falling off the balcony. Naso disagreed that "a substantial part" of the recommended work was "preventative maintenance" and characterized it as "maybe 20 percent of the contract."

¶ 39    Karen Chou owns unit 505A and is an assistant department chair and clinical professor at Northwestern University's department of civil and environmental engineering. At one of the Board meetings regarding the balcony problems, Chou volunteered that she was a licensed professional engineer and willing to help the Board evaluate the engineering report and recommendations. Chou was one of the second wave of 39 unit owners who asked for a close-up balcony inspection. Chou questioned the engineer who inspected her balcony and watched him take photos and measurements of the railing, and look at the anchors. Chou's balcony did not have structural problems. Chou got her own copy of the engineering report, met with Naso to discuss the details, and was satisfied by Naso's answers. This was before the contract had been sent out for bids. After unit owners received letters about the special assessment, there was a meeting that was "very emotionally charged, very chaotic," and "a shouting match." Chou was given an opportunity to tell them her opinion about the project but testified, "it's almost like I'm talking to my students," "I don't believe it [got] through," and no one asked her any follow-up questions. Chou disagreed with the statement, "you don't mind paying the amount you were assessed," and she said that as a condominium owner, she had to "abide by the rules."

¶ 40    Attorney Kerry Bartell testified that since 1998, she has devoted her law practice to advising and representing community associations, including advising condominium boards about their responsibilities under their declaration and the Act. Bartell advised the Board about adopting the special assessment, taking a loan, and how to respond to the unit owner petition for a referendum. The Board has a fiduciary responsibility to maintain the property, protect its residents, and make sure the association operates properly. The referendum language allows unit owners to "check on what the board's doing," but where there is an immediate threat or a mandate by law, then "we don't have any choice." At North Shore Towers, the safety issue and the mandate by law were one and the same. For something to be "mandated by law," a board did not have to wait for a municipality to tell the board to comply with the law. In Bartell's experience, "we are put behind the eight ball when we have the village involved," because the village's priority is to bring the building up to code; so in a lot of cases there are daily fines, and once the contractors are aware that the village is mandating the work, their prices "go up exponentially." It was advantageous to a condominium association to fix a code compliance issue before the municipality got involved. Once the engineers determined there was a structural integrity issue, which is an emergency and a mandate by law, Bartell told the Board of North Shore Towers not to hold a referendum because the Board members should not be delayed or inhibited in carrying out their fiduciary duties. If a special assessment were voted down by the unit owners, the Board "goes back to the drawing board and has to start over." Potentially, the Board would have to tell the Village about the engineering report and make the project much more expensive. Some condominium declarations enable the board to force specific owners to pay for the repair or replacement of "exclusive-use" limited common elements, but the North Shore Towers declaration was not written that way.

¶ 41    At the conclusion of the two-day trial, the judge took the case under advisement and rendered a written decision approximately a month later. The judge found that both the emergency and "mandated by law" exceptions apply in this instance, and she denied Dedic's motion for a permanent injunction. This is the ruling on appeal.

¶ 42    To be entitled to a permanent injunction, the party seeking the injunction must demonstrate (1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists. *Swigert v. Gillespie*, 2012 IL App (4th) 120043, ¶ 27, 976 N.E.2d 1176. Generally, a decision on whether to grant injunctive relief will be disturbed on review only if the decision is contrary to the manifest weight of the evidence. *Swigert*, 2012 IL App (4th) 120043, ¶ 28; *Gerber v. Hamilton*, 276 Ill. App. 3d 1091, 1093, 659 N.E.2d 443, 445 (1995). A trial court's judgment is against the manifest weight of the evidence if the opposite result is clearly evident. *Gerber*, 276 Ill. App. 3d at 1093.

¶ 43    However, when a case raises "pure questions of law," then the merits of a permanent injunction ruling are reviewed *de novo*. *Swigert*, 2012 IL App (4th) 120043, ¶ 28. Dedic contends that the *de novo* standard of review governs in this instance because, by agreement, the expert engineering reports and stipulated facts were admitted into evidence and the trial judge was then required only to construe the language of the section 14(g) of the condominium declaration and section 18(a)(8) of the Act and in particular the meaning of "emergenc[y]" and "mandated by law." 765 ILCS 605/18(a)(8)(ii), (iv) (West 2014).

¶ 44    Dedic supports her contention with citations to unpublished orders, that is, orders which have no precedential value and are distributed with the express warning: "NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1)." Ill. S. Ct. R. 23(e)(2) (eff. Jan. 1, 2011); see *Morrissey v. Harte*, 2014 IL App (1st) 113643-U; *Board of Directors of the Plum Creek Condominium Ass'n v. Lorman*, 2013 IL App (1st) 121198-U. Dedic does not come within any of the stated exceptions for citing an unpublished order, and we will not condone her violation of the mandatory rule by considering such orders. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 17, 961 N.E.2d 475 (citation to an unpublished order is "strictly prohibited," and neither an appellant nor appellate can use a Rule 23 order to support any claim or argument).

¶ 45    Dedic also supports her contention with cases involving summary judgment. Summary judgment is appropriate when no material fact is disputed and the facts and the law support but a single conclusion. See *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 16, 72 N.E.3d 323 ("A motion for summary judgment will be granted only where 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (quoting 735 ILCS 5/2-1005(c) (West 2012))); *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶ 50, 10 N.E.3d 307 ("In deciding a motion for summary judgment, the court must not try a question of fact but rather determine whether one exists or if reasonable persons could draw different inferences from the undisputed facts."); *Kopchar v. City of Chicago*, 395 Ill. App. 3d 762, 919 N.E.2d 76 (2009) (trial court dismissed plaintiff's claim for a mandatory injunction and entered summary judgment against plaintiff's claim under the Freedom of Information Act (5 ILCS 140/7 (West 2006))).

¶ 46    By relying on these cases, Dedic fails to acknowledge that, although the bench trial was sped along by stipulations, it was a trial, not a summary judgment proceeding, and that the judge then weighed the evidence, particularly the conflicting reports and testimony of the experts, before determining whether the facts came within either of the two statutory exceptions.

¶ 47    The trial judge's task was to make factual findings to determine whether the deterioration of the balconies posed an immediate danger to life, health, safety, or property so as to satisfy the "emergency" exception and to determine whether the repairs recommended by Naso's engineering firm otherwise came within the "mandated by law" exception, such that the condominium unit owners were not entitled to vote to reject the special assessment. Thus, the *de novo* standard is inapplicable. In these circumstances, our role is to determine whether the judge's findings are against the manifest weight of the evidence and whether the judge erred legally by denying injunctive relief. *Hess v. Clarcor, Inc.*, 237 Ill. App. 3d 434, 450, 603 N.E.2d 1262, 1273 (1992) (when trial judge heard evidence in order to resolve request for preliminary and permanent injunction, manifest weight standard governed).

¶ 48    With these principles in mind, after a full review of the record and the parties' arguments, we find no reason to disturb the trial court's decision to deny a permanent injunction to Dedic. The record demonstrates clearly that the railings of 56 of the 90 balconies posed imminent safety risks to the unit owners and constituted an "emergency" as that word is used in the condominium declaration and the Act. The record also shows that 80 to 85% of the cost of the remediation project had to be incurred to address only these 56 most dangerous balconies, with the remaining 15 to 20% of the cost being incurred for preventative maintenance. The record also clearly shows that the dangerous conditions did not comply with the local building code requirement that the balcony railings be capable of withstanding 200-pound point load pressure. Thus, the balconies not only posed safety risks that constituted an "emergency," but also their remediation was "mandated by law." Therefore, there was no entitlement to a unit owner referendum on the $1.01 million special assessment.

¶ 49    More specifically, it is undisputed that balconies 407B, 505B, 602B, and 603B suffered from significant deterioration, which made them an immediate danger to life, health, safety, or property. The balcony deterioration established in the record included degradation of the concrete foundation and/or the waterproof membrane due to moisture and other elements, corrosion, pack rust, or distortion of the steel edge channel that supported the base of the handrail, and either bowing of the handrail or detached or detaching connections between the handrail and masonry building due to the use of connectors suitable for drywall but not masonry. These facts were established by the Board's expert witness, Naso, through her structural engineering report, affidavit, and deposition and trial testimony. Naso's observations and opinions were bolstered by the various lay witnesses, and they were not disputed by Dedic's expert witness, Calamaro. In addition, Dedic conceded in the complaint she filed on October 27, 2016, that at least some of the balconies were in "need [of] 'immediate' repair," and she makes similar statements on appeal, such as "there were a few balconies that could conceivably be classified as emergencies."

¶ 50    The dangerous conditions, however, were not limited to the first four balconies, which Dedic conceded were in need of immediate remediation. The record indicates that, because of the severity of the problems that were documented in the first four balconies, the Board asked Naso's firm to expand the inspection to the entire complex. Not every balcony could be

accessed for a "close up" inspection, but Naso testified that the ground-level observations with binoculars that were performed were well accepted among structural engineers when viewing the condition of structures such as the North Shore Towers. Similarly, Calamaro used a camera from "street level" to "get a general idea" of the condition of some balconies, which he could not visit personally. All of the North Shore Towers balconies were the same age and made from the same materials, and what was observed from the ground level was similar to what had been observed close up. Based on her observations, Naso advised the Board to tell certain unit owners not to use their balconies, and she advised the Board to begin corrective work. In her July 2015 report, Naso also documented her concern about the height of the railings and the wide spacing of the spindles, and the fact that neither of these conditions met the requirements of the current building code.

¶ 51     Dedic erroneously contends the Board relied on only Naso's written report before adopting the special assessment. The record indicates Naso supplemented her written report by meeting with the Board on several occasions, and by e-mailing with the property management company that first recommended the use of Naso's firm. Naso also helped the Board obtain competitive bids from suitable contractors, and the winning bid would become the basis for the specific amount of the special assessment. Unit owner Professor Chou, who would have to pay for a portion of the repair project despite her unit's balcony being "fine" or "safe," volunteered to help the Board understand Naso's report and give her opinion as a licensed professional engineer. Chou was given her own copy of Naso's report. Chou also had the opportunity to question Naso in person, while the Board was listening, and "cross-examined" Naso about the details of her study and recommendation. Much of this conversation between the engineers was "technical" and exceeded the Board's knowledge of structural engineering concepts and the potential ways of remediating the balcony defects. Chou was also present when a member of Naso's firm came to inspect the professor's balcony, and Chou posed questions and observed his investigation techniques. Chou concluded and advised the Board that Naso's study and her recommendation were sound. Thus, the record indicates that the Board had benefit of far more than just Naso's July 2015 written report when the Board adopted the special assessment in September 2016.

¶ 52     Calamaro offered his opinion that there was no emergency because the balcony slabs were not in imminent danger of collapsing from the building, but the trial judge rejected this conclusion in part because the safety of people who use the railings as load bearing is addressed in the condominium declaration and the Act. The definition of an emergency in the declaration and Act includes not only an immediate danger to the structural integrity of the common elements of the condominium complex, as Calamaro would read the definition, but also an immediate danger to the life, health, safety, or property of the unit owners. Naso used her training, experience, and site observations to opine that many of the railings could not support a 200-pound point load. Both Naso and Calamaro testified that a balcony railing that was unable to support a 200-pound point load constitutes a safety concern, as someone who fell against or pushed the railing would not be restrained by the railing and could fall from the deck to severe injury or even death. Although a deficient railing did not meet Calamaro's definition of an emergency, he did agree that a deficient railing was a dangerous condition and that no one should use a balcony with such an inadequate railing.

¶ 53     Based on Naso's opinion, attorney Bartell testified that she advised the Board that the 200-pound load-bearing requirement for the railings fell within both the "emergency" and

"mandated by law" exceptions because the weakened railing posed a safety concern to persons or property and its remediation was mandated by law. The Board relied on this opinion when it decided to reject the petition for a unit owner referendum. Again, the undisputed testimony also indicated the cost to repair just the 56 balconies with documented defects in the deck, railing, and masonry connectors that constituted emergency conditions was 80 to 85% of the total cost, which surpassed the 115% threshold. Thus, the manifest weight of the evidence supported the judge's conclusion that the special assessment was to address an "emergency" and conditions that should be remediated as "mandated by law" and that Dedic was not entitled to an injunction preventing the Board from implementing the special assessment and executing a repair contract until after unit owners are permitted to vote.

¶ 54    Dedic contends the ruling is flawed for many reasons. First, Dedic contends there was no emergency because the Board relied on Naso's report when it adopted the special assessment, not on Naso's subsequent affidavit, and the report does not use words like "immediate" or "unsafe." However, as discussed above, the record indicates that in addition to the written report, Naso had multiple conversations with the Board and that they discussed the urgency of the situation before the Board adopted the special assessment. The Board also had the benefit of Chou's opinion, after Chou read the report and questioned Naso about the details and recommendation. The record also indicates that Naso had e-mail conversations with the property management company that was assisting the Board in its efforts to prudently and timely address the condition of the aging balconies.

¶ 55    Dedic contends there was no emergency because no written notice was sent to any unit owner to warn her or him of the danger nor were any balconies closed off. It is undisputed, however, that the owners of balconies in the worst conditions were personally contacted by the property manager and promptly warned about the danger. Dedic does not explain how the delay and formality of a written warning would be any more indicative of an "emergency" than these prompt conversations. Board president Erlich testified that the property manager contacted the unit owners who needed to be warned and that not every unit owner was contacted because not every balcony "was an emergency." Attorney Bartell's letter to Dedic in October 2016, before Dedic filed suit, included the statement, "[i]t is the opinion of [Naso's firm] that a number of the balconies are unsafe for use by the homeowners, and we understand that the Board *has already advised those owners* to refrain from using them until the repairs can be completed." Moreover, there was no need to warn Dedic because the engineering report did not suggest there was a problem with Dedic's balcony, Erlich testified that the condition of Dedic's balcony "was not an issue" and "I don't believe [she has an emergency]," and Dedic testified that there was "nothing wrong with [her] balcony."

¶ 56    Dedic also contends there is an inconsistency between the Board's indication that the condition of the balconies amounted to an "emergency" and the "glaring failure of the [Board] to do anything to remediate the balconies in the two years from the date of the report." Attorney Bartell testified, however, that the Board's fiduciary duties required it to use due diligence in evaluating the engineering report, obtaining competitive bids, and investigating the possibility of financing for unit owners who could not immediately pay the full amount. See also 765 ILCS 605/18.4 (West 2014) (stating the powers and duties of a condominium board of managers). Along these same lines, Dedic points out that no repair work was undertaken between the July 2015 engineering report and the May 2017 trial date. We reject

this as an indication that there was no "emergency" because, in addition to the time spent on the Board's due diligence, Dedic's lawsuit was reason for the Board not to proceed.

¶ 57 Dedic next contends the repair schedule shows a lack of urgency because, even though the low bid was selected in August 2016, the actual repair work was not scheduled to begin until March 2017. Dedic contends this is an indication the Board acted for convenience and not urgently. Dedic's argument, however, relies on only a brief note in the September 2016 meeting minutes that the purpose of the meeting had been "Approval of Special Assessment by Board for repair of all balconies to commence in or around March 2017 and last up to approximately 1.5 years." This brief statement does not convey enough information from which we could deduce why the Board acted or why the anticipated start date was "in or around March 2017," and we reject Dedic's contention that the schedule indicates a lack of urgency or inadequate concern about the danger the balconies posed to unit owners.

¶ 58 Finally, Dedic contends none of the repairs were "mandated by law" because there was no need to meet the updated building code, if only "a certain amount" of repair work was undertaken. The record indicates that the 200-pound point load was a legal requirement and that the special assessment was adopted in part to address that legal requirement. Furthermore, Dedic is mischaracterizing the Board's motivation for determining that the balcony railings would be remediated. Dedic cites to Naso's hearing testimony as to whether the village would require the railings to be updated in order to conform to the closer spindle spacing and higher height specified in the current building code. Naso testified that the village confirmed that it would "not force any kind of upgrade on the balconies as long as the railings were just being repaired." Dedic's argument ignores the ensuing questions and answers. Naso was next asked whether she was "considering that part, the spaces and heights" when she was forming her opinion in 2015 about "the safety or danger posed in this case." Naso answered, "[n]o, we [were] not," and she reiterated:

> "So [the issue is] not that the railings don't necessarily meet the code as they are if they were fully intact and brand new. The issue is that there has been degradation that has caused harm to the railings themselves. And because of that splitting and corrosion and section loss, that has reduced the inherent capacity of that portion of the structure."

In short, the testimony is part of a record that clearly shows that the 200-pound point load was a legal requirement and that the special assessment was adopted in part to address that legal requirement.

¶ 59 Again, there is ample support in the record to support the trial judge's findings and ruling, and we do not find any of Dedic's appellate arguments persuasive. The order on appeal is affirmed.

¶ 60 Affirmed.