MARSHALL D. LEIB, Plaintiff-Appellant, *v.* TOULIN, INC., *et al.*, Defendants-Appellees.

First District (4th Division)   No. 82—1932

Opinion filed March 24, 1983.

Mark S. Lieberman and David J. Letvin, both of Chicago (Rosenthal and Schanfield, of counsel), for appellant.

Nathan H. Dardick and Fern S. Netzky, both of Chicago (Dardick & Jadwin, of counsel), for appellee Bank of Lincolnwood.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

This is an interlocutory appeal pursuant to Supreme Court Rule 307(a)(2) (87 Ill. 2d. R. 307(a)(2)) from an order appointing a receiver to manage and liquidate a joint venture. Plaintiff also appeals from the refusal of the trial court to disqualify defendants' attorneys.

We reverse the order appointing a receiver and remand for further proceedings and determine we have no jurisdiction in an appeal pursuant to Rule 307(a)(2) to review the refusal to disqualify defendants' attorneys.

The somewhat involved background of the controversy follows:

On November 4, 1964, Marshall D. Leib (Leib), a licensed architect, contractor and real estate broker, entered into a joint venture agreement with the Bank of Lincolnwood (the Bank), a State banking association, to develop a parcel of real property located in Lincolnwood on which Leib already owned an option to purchase. At that time, the Bank was controlled by Richard Goodman. The joint venture thereby created provided for the construction of a banking facility

which would also contain other rentable commercial space. On October 18, 1965, the 1964 joint venture agreement was amended to substitute a newly created corporation, defendant Toulin, Inc. (Toulin), for the Bank as Leib's joint venturer. At that time, all of the stock of Toulin was owned by the Bank.

Long-term financing for the joint venture was arranged through a 5¾% mortgage; the Bank is not the mortgagee. This mortgage remains in place, and has a present outstanding indebtedness of approximately $933,000. The final payment on the mortgage is due in 1992. The mortgage specifies that the entire indebtedness is accelerated "if the premises are placed under the control of any court" and contains the usual prohibitions against permitting mechanic's liens to attach or remain against the mortgaged premises. The mortgage does not expressly provide for acceleration if such lien attached although the paragraph permitting acceleration in case of nonpayment, bankruptcy, or actual or threatened demolition or placing of premises under control of court, concludes by stating "or if the mortgagor fails to perform fully any other act or agreement required of the mortgagor hereunder."

The joint venture agreement as amended provided that:

"The Joint Venturers shall receive no compensation for any services rendered to the Joint Venture except as mutually agreed upon, it being understood and agreed that such parties shall mutually agree to and make provision for the payment of compensation to either of the Joint Venturers rendering special services to the Joint Venture not being rendered by the other Joint Venturer, including without limiting the foregoing, management and similar services."

In May 1966, Leib and Toulin signed a memorandum regarding leasing commissions for Leib and resident manager fees for Toulin; a revised memorandum was signed on April 11, 1969. While under these written agreements the duties were split between the two parties, in fact, according to Leib's uncontradicted testimony, the parties orally agreed that Leib (through MDL Realty which he owned) assumed all management duties except for the maintenance of certain financial records and accounts which were maintained by an assistant cashier of the Bank, without charge to the joint venture.

From the beginning the Bank has rented 40% of the building. While the lease itself is not in the record, it appears from the original joint venture agreement that the lease was to be for 25 years with certain options to renew. The base rent was $3.15 per square foot but escalated rent based on increases in the cost of maintaining and oper-

ating the building and on increases in real estate taxes was also provided for.

In the late 1970's control of the Bank was transferred to defendant, GSC Enterprises, Inc. (GSC), which now owns 96% of the Bank stock. GSC was at one time a publicly traded corporation. Majority control of GSC was obtained by the Engle group (so-called because of the dominance of Clyde W. Engle in the investment group) in the mid-1970's, who made GSC private. (See generally *Issen v. GSC Enterprises, Inc.* (N.D. Ill. 1981), 508 F. Supp. 1278.) Clyde W. Engle is chairman of the board of GSC; Roger Weston is its president; William Weaver, of the law firm of Sachnoff, Weaver and Rubenstein, Ltd. (present counsel for all defendants herein), is its secretary; and Nathan Dardick of the firm of Dardick & Jadwin (additional counsel for the Bank herein) is its registered agent. Clyde W. Engle and Roger Weston are two of GSC's three directors. The officers of the Bank include Clyde W. Engle, chairman of the board, James Hamilton, president, and Roger Weston, vice-president.

The officers of Toulin include Roger Weston, president, and Nathan Dardick, secretary. Roger Weston and Clyde W. Engle are its two directors. Toulin has no assets other than its 50% interest in the joint venture. It has no employees. Its offices are at 625 North Michigan Avenue, Chicago, on the premises of GSC. It is not listed in the phone book, building directory, or on its own front door. It was not until after June 26, 1981, that it even had stationery printed. Although the joint venture agreement as amended in 1965 provided that "there will be no transfers, assignments (or any interest therein) except to Goodman, his spouse or descendants," sometime in late 1977, or early 1978 the Bank transferred all of its stock in Toulin to GSC. Toulin in its pleadings alleged that Leib, who was then a director of the bank, approved the transfer. This allegation was denied, however, and Toulin has pointed to no evidence in the record establishing such consent. The provision in the 1965 amendment prohibiting transfers replaced a provision in the original agreement giving Leib a right of first refusal to purchase Toulin's stock at whatever price the Bank's intended transferee was to pay.

For some years prior to the takeover by the Engle group, the accounting firm of Miller, Cooper & Co. had been both the Bank's auditors and the accountants for the joint venture. At about the same time that Miller, Cooper was replaced by the Bank the joint venture, with Toulin's full approval, engaged the services of the accounting firm of Weiss and Company to do its accounting work, including preparation of rental escalation calculations. While from 1973 to 1978 the

Bank paid the rental escalation as calculated by Miller, Cooper, in 1979 Leib allegedly discovered that those calculations had understated the amount of escalated rent owed by the Bank and, on the other hand, the Bank allegedly determined that its accountant had over-stated the escalation of operating costs. Thereafter the Bank refused to pay any of the escalated rents relating to operating costs although it has paid the real estate tax escalation.

Because of this dispute over the amount of rent owed by the Bank, Toulin attempted to invoke the buyout provisions of the joint venture agreement offering to sell its interests for $800,000. After five months of unsuccessful negotiations Leib filed the instant lawsuit. The original complaint filed on July 20, 1979, was in two counts. Count I seeks a declaration of rights relating to the alleged notice of termination, asking the court to determine that the notice was not an offer within the meaning of the 1965 amendment to the joint venture agreement, or alternatively, that an injunction issue precluding defendants from refusing to permit Leib to accept or reject the pro-posal contained in the notice. Count II sought a declaration of rights relating to the 1978 transfer of Toulin's stock from the Bank to GSC. Leib requested a declaration that he was entitled to purchase the Toulin stock upon payment of the same consideration paid by GSC. The defendants filed an appearance but did not file an answer until late 1981. The parties attempted in the interim to settle their differ-ences but in January 1981 Leib refused to sign a tentative settlement agreement because, while he would have waived his claims with preju-dice, Toulin's withdrawal of its notice of termination did not prevent it from sending a new notice of termination.

In April 1981, as found by the trial court, Toulin began to refuse to sign checks to Leib for his services. Toulin has made no contention that the service contracts were not still in effect at that point.

Since the Bank was still refusing to pay the rent allegedly due, Leib, on June 22, 1981, unilaterally served the Bank with notice of default and termination of its lease for failure to pay rent escalations due the joint venture according to Leib's calculations. Although Wes-ton admitted at trial that it was to the interest of the joint venture to maximize its revenues, Toulin wrote Leib on June 26, 1981, that his action against the Bank was not authorized and that he was no longer authorized to act for the joint venture. On July 14, 1981, Leib filed a forcible detainer action against the Bank. This action was later dis-missed, that court determining that Leib and Toulin must settle their differences before suit could be brought against the Bank.

Notwithstanding Toulin's alleged barring of Leib from their mana-

gerial and service positions on behalf of the joint venture in June 1981, those entities in fact continued to perform and contract for all management and related services for the building. Toulin, on the other hand, on October 1, 1981, unilaterally employed Romanek-Golub and Company to act as its agent to manage the building. Under this management agreement, the joint venture had no control over the operations of the building. While all expenses were to be paid by the joint venture, only Toulin could authorize or approve expenditures. Furthermore, although the joint venture agreement as amended provided that:

> "The funds belonging to the Joint Venture or held by it for others shall be kept in such bank or banks as may be designated by the Joint Venturers and prior to such designation in the Bank, and the same shall be subject to withdrawals upon checks for drafts drawn in the name of the Joint Venture by the Joint Venturers jointly, or by either of such parties or such other person who may be designated by the Joint Venturers jointly."

Romanek-Golub was directed to deposit the revenues of the joint venture into a bank account selected only by Toulin and not by the joint venturers as required by the contract. Furthermore disbursements from that account were to be made at Toulin's direction only although the joint venture agreement gave Leib equal authority to make disbursements with Toulin, and, as apparently found by the trial court, required any other person making withdrawals to be designated by both joint venturers. The contract also provided that only Toulin could approve leases.

On October 1, 1981, Romanek-Golub sent computerized rental statements to the tenants in the building directing that they send their rent to Romanek-Golub at 625 North Michigan Avenue. Also on or about October 2, 1981, Romanek-Golub sent correspondence to the tenants in the building announcing that it was taking over "responsibility for all property related functions including day-to-day maintenance and administration," and asking that rental payments be forwarded to Bernice Cantor at the Bank of Lincolnwood. A bank account was opened in the name of Romanek-Golub, in which all rental income was deposited, subject only to the signature of Romanek-Golub, which in turn took its "marching orders" exclusively from Toulin.

Thereafter, on October 26, 1981, Leib obtained leave of court to file an amended complaint. The amended complaint prayed for a declaratory judgment relating to the alleged termination notice served

on February 12, 1979, which was the subject of count I of the original complaint herein, and in count II sought a preliminary and permanent injunction prohibiting the continued retention of Romanek-Golub as manager of the building, and requiring all joint venture funds received by any of the defendants or their agents to be deposited in the joint venture bank account subject to withdrawals only upon the signature of both Toulin and Leib. Leib also sought an order enjoining interference with his function as property manager of the building, enjoining interference with Leib's interest as a joint venturer, and an accounting. The trial court on November 12, 1981, prohibited Romanek from disbursing joint venture funds without 48-hour notice to all parties. Apparently Romanek has interpreted this order to bar distribution of funds not approved by both joint venturers as from that time forward it sought Leib's approval before disbursing any funds. Romanek still did not pay the bills submitted by vendors engaged by Leib for work done prior to October 1, 1981, although it would appear the joint venture owes such monies since Leib would have had at least apparent authority to bind it. Because of the refusal to pay such bills pursuant to instructions from Toulin, there has been a threat of possible mechanics' lien filings.

On November 13, 1981, defendants answered the amended complaint, denying the material allegations and raising a variety of affirmative defenses. Toulin also requested an accounting and liquidation of the joint venture.. Thereafter on November 30, 1981, Toulin filed a motion to appoint a receiver alleging:

"3. For some time prior to June, 1981 Toulin and Leib had been involved in disputes with respect to numerous matters concerning the management, operation, maintenance and leasing of the Bank Building including, but not limited to:

a.) The amount, if any, of escalated rents due from the Bank of Lincolnwood to the Joint Venture or whether the Bank of Lincolnwood had paid excess rents to the Joint Venture and was entitled to a refund or rent abatement and the proper accounting method for making such calculation.

b.) Fees due the Bank of Lincolnwood for bookkeeping services rendered to the Joint Venture and reimbursement for postage advanced by the Bank of Lincolnwood on behalf of the Joint Venture.

c.) The amount of fees charged by Leib and companies controlled by Leib for services rendered to the Joint Venture.

d.) The unilateral action of Leib sending the principal tenant of the Bank Building, being the Bank of Lincolnwood, a no-

tice of default and termination of tenancy based upon non-payment of the rent escalation when there was substantial dispute about how to compute the escalation.

e.) Toulin's distrust of Leib and its belief that Leib intended to harm the Joint Venture and that Leib had been causing the Joint Venture to pay for services rendered at higher than the reasonable costs for such services, including payments to Leib and/or companies controlled by him.

\* \* \*

4. On June 26, 1981 Toulin served a notice on Leib demanding that he stop performing any services for the Joint Venture at the Bank Building, that he withdraw his notice of termination of tenancy to the Bank of Lincolnwood and that he cease taking actions which were designed to harm the Joint Venture.

5. After June 26, 1981 the relationship between the parties further deteriorated and the disputes between the parties began to substantially interfere with the management, operation, maintenance and leasing of the Bank Building, such disputes including but not limited to:

a.) Inability of Toulin and Leib to agree upon who should manage the Bank Building insofar as Toulin desired to have the professional management services of a qualified real estate management company and selected Romanek-Golub & Company and Leib insisted that he should be paid for and had the right to manage the Bank Building.

b.) Inability of Toulin and Leib to agree on who should be the accountants for the Joint Venture, Toulin requesting that one of the major national accounting firms be selected and Leib insisting that a local small accounting company that Toulin believes takes instructions from Leib on accounting matters in dispute (procedures for computing escalated rents) do the accounting for the Joint Venture.

c.) Toulin's continued distrust of Leib caused by substantial questions being raised about Leib's past practices with respect to building maintenance, reserves for repairs, rental policies as to rate and term, selection of vendors without competitive bids, charging over-rides of 20% (10% for MDL Construction and 10% for Marshall D. Leib and Associates Architects) on tenant improvements, as well as other management matters.

d.) Leib's filing a forcible entry and detainer action against the Bank of Lincolnwood in July, 1981, in spite of the fact

that Toulin specifically directed Leib not to do so and specifically disputed Leib's conclusion that the Bank of Lincolnwood was in default under its lease.

e.) Leib's continued attempt to bind the Joint Venture to certain vendors despite specific instructions not to do so.

f.) Leib's filing his amended complaint on October 22, 1981 seeking to enjoin and prevent Romanek-Golub & Company from managing the Bank Building.

6. Toulin and Leib are presently joint venturers who are deadlocked with respect to the status of the Joint Venture and with respect to the managing, operating, maintaining and leasing of the Joint Venture's asset, to wit, the Bank Building.

7. The joint venturers are no longer capable of maintaining their partnership relationship and the size and complex problems involved in the management, operation, maintenance and leasing of the Bank Building requires active and constant attention which, if neglected and not provided, will result in damage, deterioration and waste of the property to the substantial detriment of all parties hereto. ***"

The trial court over Leib's objection decided to hear the motion to appoint the receiver prior to the motion for preliminary injunction. The only witnesses were Richard Abraham, vice-president of the Commercial Property Management Division of Romanek, Roger Weston and Leib.

Abraham testified he took his "marching orders" only from Toulin and stated "we treat the Bank differently or separately than the way we treat the rest of the tenants in the Building." While he collected the base rent from the Bank he was instructed by Toulin not to collect any escalated rents based on operating expenses from the Bank. Romanek was not told both sides of the dispute. He was also told not to pay any bills submitted by Leib or Leib's entities for services rendered to the joint venture, including those rendered prior to October 1, 1981. Toulin also instructed them not to pay any vendors for work Romanek had not authorized. Because of Toulin's instructions, vendors performing services prior to October 1, 1981, have not been paid even though there is no dispute they did the work. Toulin refused to permit the vendors to be paid despite the possibility the vendors might file mechanics' liens and even though its lawyers informed them this might constitute a default in the mortgage. There was no evidence any of the vendors were incompetent or improperly selected. To the contrary, many of the same people obtained by Leib were retained and used by Romanek.

Abraham testified that the building is 18 years old and structurally in "pretty good shape." Inside, there was some obsolescence and some things were "behind the times." He felt the mechanical system was "on the verge" of needing some sort of capital improvement program. Furthermore windows had not been washed in several years; he admitted however that they still had not been washed at the time of trial five months after Romanek took over. He believed that for the building to be competitive the lobby, interior corridors and ceilings should be improved. At present the Bank's base rent is only $3.15 per square foot. Other tenants pay average rents of $9 per square foot. This he felt was not competitive with other suburban bank buildings in the area; $12 per square foot would be, and this building would command such charges if certain basic changes in matters such as decor were made. In fact, however, Leib obtained several leases at that price. He agreed that the outstanding leases were not below the market given the age of the leases. He also agreed that if the Bank was ejected and replaced with another tenant, the building would get more revenue; the lobby space they occupied was valuable space.

According to Abraham the building was 7% vacant. Despite the disputes between the joint venturers, persons wishing to renew leases had managed to do so although in some instances they stayed without a signed lease. The building had been making a profit when Romanek took over and it was still making a profit.

Abraham testified that there was some confusion among the tenants as to what responsibilities were to be performed by whom. For example when there was a small fire at the Bank of Lincolnwood, MDL (Leib's corporation) was contacted and handled the matter on a short-term basis.

At the time of trial, according to the witness, Romanek had not been paid for its services. If it was not paid within a reasonable time, it would not continue to manage the building.

Roger Weston is the vice-president of the Bank, and the president of both GSC and Toulin. He is only paid by the Bank. He did not go on the Bank's payroll until 1979 although he became vice-president in 1977. When and after he came to the Bank the Bank acted for Toulin in doing its resident management functions. Weston did not know if Leib had consented to this. He also did not know what either the Bank or Leib did on a day-to-day basis. The Bank never charged for the services of Bernice Cantor until the spring of 1981.

Weston testified that Miller, Cooper were used as the joint venture accountants until they ceased doing any accounting work for the Bank. Then he said "we" hired Weiss & Company as the new account-

ing firm for the joint venture to prepare the tax returns, prepare financial statements and to resolve the escalator issue. Only after Weiss resolved that latter issue unfavorably to the Bank did Weston demand that another accountant be used on the grounds that since Weiss reached conclusions which inured to Leib's benefit, Weiss could not be considered sufficiently independent to act as accountants for the joint venture.

Weston testified he hired Romanek as a response to the notice to terminate the lease, because Leib was harming not only the joint venture but the Bank, and that the joint venture was losing a hundred thousand dollars worth of income and had a negative cash flow. Weston cited no facts to support the last statements and indeed admitted that the building had a surplus cash flow and was profitable.

He testified that Romanek was doing the management jobs given to it and that it was doing a reasonable job. It had been instructed to collect only the base rent from the Bank and not the escalated rent. he also told it to pay only the vendors selected by it and no others. At that time he was aware that there were unpaid vendor bills for services rendered prior to October 1981. He did not investigate the vendor bills and his instruction not to pay was without regard to whether the services had been performed or the bills were fair and reasonable. Weston admitted that Leib had the right to act on behalf of the joint venture without him or Toulin. Weston did not know if he had the right to hire a new manager as he did.

Although there was a 7% vacancy in the building Weston refused to allow Leib to lease space on the building at $12 per square foot. Weston did not even review the lease.

Weston conceded that there was a conflict of interest between his positions for the Bank and GSC and his role as joint venturer. On occasion he did not know "which hat he was wearing." He tried to do the best he could. He did not know which hat he was wearing when he was attempting to resolve the escalated rents issue. It was to the interest of the joint venture to maximize the rent but it was to the tenant's interest to minimize the rent.

Leib testified that there was a dispute between the parties as to who should manage the building. It was his position that since it had been jointly agreed that he should manage it, that relationship could not be terminated unilaterally. He also explained that certain payments were made to MDL Realty in 1980 for invoices dated 1977 because he had agreed with Toulin to defer his fees during the recession until the building was fully rented and funds were available.

While the court concludes, as hereinafter discussed, that the facts

do not warrant the appointment of a receiver, we sympathize with the trial court's exasperation with the parties which led to the appointment. For example, although both Leib and Toulin had signed a written agreement with Weiss & Co. for that company to do the tax returns for 1981 Toulin refused to turn over the books to Weiss until ordered to do so by the trial court. Likewise Leib refused to allow GSC and Toulin to have the joint venture records for the period January 1 through September 30, 1981, until ordered by the trial court; GSC needed these records in order to file certain reports required by law. Such conduct on the part of both parties cannot be justified by the fact they were in litigation.

I

The principal issue in this case is whether a trial court can appoint a receiver because the joint venturers have been in disagreement over who can manage the business although the business has been and is making a profit. We hold that mere disagreement is insufficient to permit the appointment of a receiver and reverse and remand for further proceedings. We further hold that since the trial court's order appointing a receiver was appealed under Supreme Court Rule 307(a) (87 Ill. 2d R. 307(a)), this court has no jurisdiction to consider the trial court's refusal to disqualify defendants' attorneys although the law firm is defending plaintiff in a Federal case involving in part some related issues.

The trial court appointed a receiver to liquidate the assets of the joint venture and removed Romanek as manager since it was hired unilaterally. In appointing the receiver it pointed to the dissension between the parties saying "the dangers these disagreements pose for the continued profitability of the joint venture require this Court to act." It also referred to the possible encumbrance by mechanic's lien claims or mortgage foreclosure. Finally, it found that it was in the best interest of the joint venture for Leib to be allowed to become a tenant of the building.

■ It is true that the appointment of a receiver resides in the arsenal of equitable remedies to be used when in the sound discretion of the chancellor it is needed to insure complete justice is done between the parties. (*Hurst v. Papierz* (1973), 16 Ill. App. 3d 574, 306 N.E.2d 532, *cert. denied* (1974), 419 U.S. 835, 42 L. Ed. 2d 62, 95 S. Ct. 62.) It is also true that the appointment of a receiver is within the sound discretion of the trial court. (*First Federal Savings & Loan Association v. National Boulevard Bank* (1982), 104 Ill. App. 3d 1061, 433 N.E.2d 1036.) Nevertheless it is a harsh remedy and should not be ex-

ercised doubtingly, but only after the court has been convinced that such remedy is absolutely necessary to prevent irreparable losses. (*Iowa Structures Unlimited, Inc. v. First National Bank* (1981), 99 Ill. App. 3d 180, 425 N.E.2d 64.) As this court stated in *Poulakidas v. Charalidis* (1979), 68 Ill. App. 3d 610, 614, 386 N.E.2d 405, 408:

> "However, in such cases the standards by which the court's appointment of a receiver must be measured are exceptionally stringent. A court of equity has the power to appoint a receiver of a corporation only when conditions of dissension, dispute, fraud or mismanagement exist, which make it impossible for the business to continue or to preserve its assets. (*Duval v. Severson* (1973), 15 Ill. App. 3d 634, 304 N.E.2d 747.) It is well recognized that the appointment of a receiver is an extraordinary and drastic remedy to be exercised with great caution. (*Bagdonas v. Liberty Land & Investment Co.* (1923), 309 Ill. 103, 140 N.E. 49; *Steinwart v. Susman* (1968), 94 Ill. App. 2d 471, 238 N.E.2d 200; *Cohen v. Financial Acceptance Co.* (1965), 56 Ill. App. 2d 359, 206 N.E.2d 308.) The appointment of a receiver is appropriate only in cases of urgent necessity where there is a present danger to the interests of the investors, consisting of a serious suspension of the business and an imminent danger of dissipation of the corporate assets. (*Firebaugh v. McGovern* (1949), 404 Ill. 143, 88 N.E.2d 473.) Even where the appointment of a receiver is temporary and for the limited purpose of preserving property and continuing the business until the dispute between the parties can be resolved, these rigid standards must be applied. *Firebaugh v. McGovern* (1949), 404 Ill. 143, 88 N.E.2d 473." (In accord, *Prassas v. Nicholas W. Prassas & Co.* (1982), 102 Ill. App. 3d 319, 430 N.E.2d 28.)

Despite the appellees' allegations, there was absolutely no evidence of fraud or mismanagement. It is undisputed that the parties are in disagreement but that in itself is insufficient to warrant the appointment of a receiver. (*Prassas; Poulakidas.*) Rather, it must be shown that the dissension made it impossible for the business to continue to preserve its assets or created a danger that it might be placed beyond the jurisdiction of the court. (*Prassas.*) While there was proof that the joint venture was in grave danger of losing its only asset if a receiver was appointed, there was no proof that the business assets were in immediate danger of dissipation or loss. To the contrary the evidence established that the business was flourishing. There was some concern that the assets would be impaired at some future time but such a

speculative fear is insufficient to warrant the appointment of a receiver. (*W. E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.* (1983), 112 Ill. App. 3d 847.) Furthermore, much of this concern arose out of the possibility Romanek would resign if not paid, and the building would be left without a manager. This danger could have been avoided, however by an expeditious hearing of Leib's injunction action which raised the issue of who had the right to manage the building. Finally it would be inappropriate for the court to rely on the possibility of mechanic's liens to appoint a receiver at Toulin's request when it was Toulin who has refused to pay the claims and thus made the lien possible particularly since Toulin has presented no justification in law for its refusal to allow their payment. It would be inequitable to allow Toulin an advantage from its own wrongful acts. *Gerard v. Gateau* (1876), 84 Ill. 121.

In addition the appointment of a receiver is warranted only when there is no other adequate remedy or means of securing the desired result. (*Poulakidas v. Charalidis* (1979), 68 Ill. App. 3d 610, 386 N.E.2d 405.) Here a resolution of the issues raised in Leib's complaint plus the issuance of an injunction requiring the parties to cooperate with the manager of the building, once Leib's injunction claim is decided, would appear to be adequate.

## II

Leib on appeal also contends that the trial court should have granted his motion to disqualify defendants' attorneys. As already noted, in the mid-1970's the Engle group took over GSC. A lawsuit ensued. (See *Issen v. GSC Enterprises, Inc.* (N.D. Ill. 1981), 508 F. Supp. 1278.) Leib and the Bank are among the defendants in that suit which was still continuing at the time of trial in the present case and were represented by the firm of Schnoff, Weaver and Rubenstein, Ltd. Nathan Dardick originally was a member of that firm. Among the issues in that case is the reasonableness of the rent paid by the Bank, which at least indirectly is an issue in this case. Leib did not move to disqualify the attorneys until approximately two weeks before trial was scheduled to commence. The trial court denied the motion because of the delay which would ensue.

While we recognize the seriousness of the issue, this court is without jurisdiction to review this action of the trial court. Only final judgment or orders are appealable unless the particular judgment or order comes within one of the specified exceptions set forth by the rule. (*City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 380 N.E.2d 1106.) The refusal to disqualify an attorney

is not a final order nor does any supreme court rule authorize an appeal from an interlocutory order of that nature.

This court does have jurisdiction under Supreme Court Rule 307(a) (87 Ill. 2d R. 307(a)), of the appeal from the order to appoint the receiver. But the only question properly before this court on that appeal is whether there was a sufficient showing to sustain the trial court's order granting the receivership. (*S & F Corp. v. American Express Co.* (1978), 60 Ill. App. 3d 824, 377 N.E.2d 73.) This court does not have jurisdiction to consider other interlocutory orders not listed in Supreme Court Rule 307. *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 380 N.E.2d 1106.

Because we have already determined that the trial court's order appointing a receiver was without foundation, we reverse and remand the case for further proceedings on Leib's complaint.

Reversed and remanded.

JOHNSON and JIGANTI, JJ., concur.