2022 IL App (1st) 210876-U

No. 1-21-0876

Order filed March 17, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| | ) | |
| JENA EBERLY STACK, JONATHAN STACK, AARON GOTTLIEB, and MELISSA MAHABIR, | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | Appeal from the |
| v. | ) | Circuit Court of |
| | ) | Cook County. |
| 4325-27 N. HAZEL STREET CONDOMINIUM | ) | |
| ASSOCIATION, an Illinois Not-For-Profit Corporation, | ) | |
| BOARD OF DIRECTORS OF 4325-27 N. HAZEL | ) | No. 19 CH 6626 |
| STREET CONDOMINIUM ASSOCIATION, MARK | ) | |
| FLAMME, HEATHER FLAMME, SCOTT J. LARSON | ) | |
| AND JESSICA A. SMITH a/t/o LARSON TRUST dated | ) | Honorable |
| June 18, 2014, BETHEL BURTON a/t/u/t/ dated | ) | Moshe Jacobius, |
| December 7, 2015 and designated as the BETHEL | ) | Judge, presiding. |
| JOHNSON BURTON REVOCABLE TRUST, TYRA | ) | |
| DIXON, SCOTT LARSON and ANDREW KIPER, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

(4325-27 N. Hazel Street Condominium Association, an )
Illinois Not-For-Profit Corporation, Board of Directors of )
4325-27 N. Hazel Street Condominium Association, Mark )
Flamme, Heather Flamme, Scott J. Larson and Jessica A. )
Smith a/t/o Larson Trust dated June 18, 2014, Bethel )
Burton a/t/u/t/ dated December 7, 2015 and designated as )
the Bethel Johnson Burton Revocable Trust, Tyra Dixon, )
and Scott Larson, Defendants-Appellants). )
)

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order granting plaintiffs' motion for the appointment of a receiver is affirmed.

¶ 2    This is an interlocutory appeal from the appointment of a receiver. On July 2, 2021, following a two-day evidentiary hearing, the trial court entered an order granting plaintiffs' motion for the appointment of a receiver for the six-unit condominium building located at 4325 North Hazel Street, Chicago, Illinois.

¶ 3    Defendants filed a timely notice of appeal on July 30, 2021. We have jurisdiction over the instant appeal under Illinois Supreme Court Rule 307(a)(3) (eff. Nov. 1, 2017), which permits a party to file an interlocutory appeal from an order "giving or refusing to give other or further powers or property to a receiver or sequestrator already appointed."

¶ 4    In their appeal, appellants, collectively referred to as the "Flamme Group," argue that the trial court abused its discretion when it granted appellees', collectively referred to as the "Stack Group" motion for the appointment of a receiver. Defendants' challenge includes a claim that the

trial court erroneously determined that defendants were not authorized to take various actions pursuant to "owners meetings" held by them.

¶ 5       For the reasons that follow, we affirm the trial court's judgment.[1]

¶ 6                                   I. BACKGROUND

¶ 7       The 4325-27 N. Hazel Street Condominium Association governs the six-unit condominium building at 4325 North Hazel Street. The relevant provisions of the condominium declaration and bylaws are as follows.

¶ 8                   A. The Association's Condominium Declaration and Bylaws

¶ 9       Article V Section 1 of the condominium declaration provides that the direction and administration of the property are vested in a "board of owners" consisting of six persons. Each board member must be either a unit owner or a legally designated agent of the owner.

¶ 10      Article V Section 2 of the condominium declaration is directed to "Voting Rights." It provides that "there shall be one person with respect to each Unit Ownership who shall be entitled to vote at any meeting of the Board."

¶ 11      Article V Section 3 of the condominium declaration provides that meetings are to be held in the following manner:

    "(a) Meetings of the Board shall be held at the Property or at such other

    place in Cook County, Illinois, as may be designated in any notice of a meeting.

    The presence in person or by proxy at any meeting of the Board having a majority

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

of the total votes shall constitute a quorum. Unless otherwise expressly provided herein, any action may be taken at any meeting of the Board at which a quorum is present upon the affirmative vote of the members having a majority of the total votes present at such meeting."

¶ 12    Article V Section 3 of the condominium declaration further delineates two kinds of meetings: annual meetings and special meetings. As is relevant to this appeal, the provision for special meetings states:

"(c) Special Meetings. Special meetings of the Board may be called at any time for the purpose of considering matters which, by the terms of this Declaration, require the approval of all or some of the members, or for any other reasonable purpose. Said meetings shall be called by written motion, authorized by a majority of the Board and delivered not less than ten (10) days prior to the date fixed for said meeting. The notice shall specify the date, time, and place of the meeting and the matters to be considered."

¶ 13    Article V Section 5 of the condominium declaration sets out the "General Powers of the Board." This section grants expansive rights to the board to, among other things, govern the maintenance and upkeep of the condominium building. The board's powers include providing insurance for the units and the common area and obtaining materials, labor, and services required for the maintenance and operation of the property. The board is also responsible for all contracts entered into on behalf of the Association.

¶ 14    As is relevant to this case, Article I Section 1 of the Association's bylaws provides that (1) each unit owner shall become a member of the board, (2) each member of the board shall be an owner, the spouse of an owner, or an individual legally designated as the agent of the owner, and (3) one individual from each unit shall be entitled to vote at any meeting of the board.

¶ 15    Article I Section 3 of the bylaws provides that "unless otherwise expressly provided herein, any action may be taken at any meeting of the voting members at which a quorum is present upon the affirmative vote of the voting members having a majority of the total votes present at such meeting."

¶ 16    Article I Section 3(b) of the bylaws provides:

> "Special meetings of the voting members may be called at any time for the purpose of considering matters which, by the terms of the Declaration, require the approval of all or some of the voting members, or for any other reasonable purpose. Said meetings shall be called by written notice, authorized by a majority of the Board. The notice shall specify the date, time and place of the meeting and the matters to be considered."

¶ 17    Article I Section 3(d) states:

> "Fifty-one percent (51%) of the voting members shall be necessary to constitute a quorum at any meeting, annual or special."

¶ 18    With this backdrop in place, we now turn to the procedural history of this action.

¶ 19                                 B. Procedural History

¶ 20    On May 30, 2019, plaintiffs Jena Eberly Stack, Jonathan Stack, Aaron Gottlieb, and Melissa Mahabir filed a "Complaint for Declaratory Judgment, Breach of Fiduciary Duty, and Other Relief." The complaint alleged the following uncontested facts:

"3. Plaintiffs Jena Eberly Stack and Jonathan Stack are the owners of Condominium Unit 2S in the 4325-27 N. Hazel Street, Chicago building.

4. Plaintiffs Aaron Gottlieb and Melissa Mahabir are the owners of Condominium Unit 3N in the 4325-27 N. Hazel Street, Chicago building.

5. Defendant, 4325-27 N. Hazel Street Condominium Association, is an Illinois Not-For-Profit Corporation, and is the Association for the aforesaid condominium building.

6. Defendant, Board of Directors of 4325-27 N. Hazel Street Condominium Association, is an Illinois Not-For-Profit Corporation, and is the elected Board for the aforesaid condominium building.

7. Defendants Mark Flamme and Heather Flamme are the owners of Condominium Unit 3S in the 4325-27 N. Hazel Street, Chicago building. Defendant Heather Flamme is a member of the Board of Directors and is acting as Treasurer.

8. Defendant Larson Trust are the owners of Condominium Unit 2N in the 4325-27 N. Hazel Street, Chicago building.

9. Defendant Scott Larson is a member of the Board of Directors and is acting Secretary.

10. Defendant Burton Trust is the owner of Unit I N in the 4325-27 N. Hazel Street, Chicago building.

11. Defendant Tyra Dixon, on information and belief, is a beneficiary of the Burton Trust. Dixon is a member of the Board of Directors.

12. Defendant Andrew Kiper is the owner of Unit 1S in the 4325-27 N. Hazel Street Chicago building.

13. Defendants Burton Trust/Dixon, Flamme and Larson maintain that the percentage ownership interest in their three units total fifty-one (51%) percent."

¶ 21 Plaintiffs' complaint alleged that defendants held "owners' meetings" in the absence of a properly constituted quorum and that such meetings resulted in actions that threatened immediate and future damage to the association. Examples of allegedly unauthorized actions included:

a) Voting to instruct the association's then-management company to terminate all contact with and suspend payment to all vendors except common building expenses, resulting in certain vendors' invoices remaining unpaid, the incurring of late fees and interest, and the threat of imminent litigation,

b) Failing to release payments due to a contractor who had completed a mandatory capital project that was the subject of pending litigation based on a violation of the City of Chicago Code, and for which the contractor had commenced lien and collection litigation against the association,

    c) Terminating, without replacement, association counsel during the pendency of a forcible entry and detainer action pending against defendant Burton Trust/Dixon for long-overdue assessments totaling over $15,000, and

    d) Voting to retain a "forensic accountant" to examine the association's financial books and records dating back four years, without demonstrating any need for an accounting, and without disclosing, prior to a vote, that a letter of engagement had already been signed with the accounting firm.

¶ 22    Based on the preceding actions, in Count I, plaintiffs sought a declaratory judgment (1) declaring that under the declarations and bylaws of the association a majority is defined as one vote per board member, and that a non-weighted simple majority vote constitutes a proper quorum; (2) declaring any actions taken by defendants without a properly constituted quorum unauthorized and void; and (3) granting any and all other relief deemed appropriate by the court.

¶ 23    In Count II, on the basis of the same complaints outlined in Count I, plaintiffs alleged a breach of fiduciary duty and sought the appointment of a receiver to manage and run the affairs of the board and association and requested a judgment against defendants Burton Trust, Tyra Dixon, Heather Flamme, and Scott Larson, for $50,000 in addition to the costs incurred in bringing this action. Count II contained additional charges against defendant Larson, in his capacity as board secretary, against defendant Heather Flamme, in her capacity as board treasurer, and against Burton Trust/Dixon, based on an alleged conflict of interest with the association from a pending forcible entry and detainer action against them.

¶ 24    In Count III, plaintiffs alleged that defendants' actions violated section 19(b) of the Illinois Condominium Property Act (765 ILCS 605/19(b) (West 2018)), (Condominium Act), where they refused to make requested financial records available for examination, inspection, and copying. Plaintiffs sought an order compelling the transmission of the requested records and an award of reasonable attorney fees.

¶ 25    On November 27, 2019, defendants filed an "Answer to the Complaint and Counterclaim for Declaratory Relief." In it, defendants denied that they had taken improper actions. Defendants relied on section 3(b) of the association's bylaws as well as section 18(b)(5) of the Condominium Act to support their actions. The essence of defendants' claim was that they were authorized to conduct "unit owners' meetings" based on their weighted 51.6% ownership of the property. Defendants believed that their majority weighted ownership interest enabled them to establish a quorum without the participation of any other unit owners and to conduct board-related duties on this basis.

¶ 26    Defendants requested that their actions be deemed actions of the association binding on all members and find and declare that the unit owner members of the association were authorized to take actions related to construction projects and contracts for work or services, including legal services, property managers, and expenditures and bills at special meetings held by unit owners.

¶ 27    On September 18, 2020, plaintiffs filed a "Motion for Appointment of Custodian/Manager and Other Relief." Defendant Kiper joined in plaintiffs' motion.

¶ 28    Plaintiffs' motion alleged that the Flamme Group acted and continued to act in a manner oppressive to plaintiffs' interest in the building and in dereliction of the obligations imposed on

them by the association's governing documents and applicable Illinois law. Plaintiffs alleged that the association's operations, including but not limited to critical and necessary repairs, overdue and required maintenance, and the overall general and financial operation of the association had come to a near stand-still.

¶ 29 Plaintiffs further alleged that the critical issue requiring resolution was what constitutes a proper board vote. Plaintiffs maintained that the association's declaration and bylaws made each unit owner a board member and that a majority of four members was required for a lawful quorum to be constituted.

¶ 30 On October 19, 2020, defendants filed a response to plaintiffs' motion. In it, they opposed the appointment of a receiver, maintaining that plaintiffs failed to demonstrate that either an extreme hardship or irreparable damage required the appointment. Defendants maintained that several actions had been taken during the pendency of the litigation to manage the building and prevent it from falling into disrepair. Defendants maintained that they were entitled to hold "owners' meetings" because their combined interest in the property exceeded 51%.

¶ 31 On December 15, 2020, the trial court ordered the parties to file briefs related to the declaratory action filed by plaintiffs. On December 28, 2020, both parties filed briefs in support of their respective positions.

¶ 32 On May 24 and May 25, 2021, the trial court held an evidentiary hearing limited to plaintiffs' motion to appoint a receiver. Testimony was provided by Jonathan Stack, Dr. Andrew

Kiper[2], Aaron Gottlieb, Scott Larson, Jena Stack, Tyra Dixon, and Heather Flamme. We now turn to a discussion of the trial court's findings based on the testimony of these witnesses and evidence presented at the hearing.

¶ 33                                    C. The Trial Court's Findings

¶ 34    In its lengthy and highly detailed written order, the trial court made extensive findings which we now summarize.

¶ 35    The trial court found that the association board consisted of Scott Larson, Tyra Dixon, Heather Flamme, Andrew Kiper, Jonathan Stack, and Melissa Mahabir. The board lacked both a president and a vice president. The only board officers were Heather Flamme, who served as treasurer, and Scott Larson, who served as secretary. The previous board president, Jena Stack, held the position from September 2016 to March 2019, when she resigned. No meetings were scheduled to elect a board president since that time. There was also no association attorney, regular accountant, or property management company. It was unclear whether tax returns were filed for the past two years.

¶ 36    Since Ms. Stack's resignation as board president, the association only held three board meetings. In January 2021, a board meeting was called and attended by all voting members. All six board members were confirmed at this time, and it was agreed that all association materials would be shared. The meeting ended abruptly and acrimoniously.

---

[2] At the time of the evidentiary hearing, a board-approved collections case was pending against Dr. Kiper for unpaid assessments.

¶ 37 Defendants conducted "owners meetings" beginning on February 1, 2019. The Stack Group did not attend these meetings. At the February 1 meeting, major actions were taken, including (1) terminating the current association attorney; (2) hiring a new attorney; (3) terminating all contracts with the previous property manager; and (4) instructing the current property manager to cease making payments to all vendors except common building expenses.

¶ 38 At a December 4, 2020, owners meeting, defendants voted in favor of exercising "whatever legal steps are available for the [a]ssociation to oppose the matter in the event that a third party is brought in to usurp the rights of the [B]oard members and override decisions voted on and recorded in a duly called [B]oard meeting."

¶ 39 The trial court noted that the testimony demonstrated the existence of building maintenance issues requiring the board's attention. The issues raised by plaintiffs included the presence of black mold in one unit, the need for tuckpointing, and a sewage smell coming from the basement. When a contractor detected black mold in the Gottlieb/Mahabir unit, he warned of the possibility of recurrence unless tuckpointing work was performed on the building's north wall. Mr. Gottlieb testified that efforts by the couple to independently obtain estimates for tuckpointing work met with resistance where the association failed to provide the necessary documentation.

¶ 40 On the other hand, Mr. Larson testified that upon learning of the black mold in the Gottlieb/Mahabir unit, he and his wife hired a company to conduct a mold test in the building. The test came back clean, and there was no evidence that any black mold was currently present in the building.

¶ 41     The court found that tuckpointing had been an ongoing issue since at least 2017. Mr. Stack, Dr. Kiper, and Mr. Gottlieb all testified that there was an urgent need for tuckpointing along the north wall. Dr. Kiper also testified his west wall leaked when it rained, although he had not requested tuckpointing for that wall from the association.

¶ 42     Mr. Larson testified that the Flamme Group obtained multiple estimates for tuckpointing and that they agreed with one of the estimates and intended to move forward with the work, but because of the pending litigation and disagreement between the two groups, no work had been done, and the issues remained unresolved.

¶ 43     Dr. Kiper testified about a sewage smell emanating from the basement of the building that traveled to his unit when his central HVAC unit operated. Dr. Kiper notified the board of the issue in August 2020.

¶ 44     Ms. Flamme testified that she was aware of the issue but could not recall whether anything had been done to address it.

¶ 45     The court also noted the existence of dissension among the unit owners based on a question of whether to change insurance carriers. Miscommunication among the owners resulted in a new, more costly policy being approved by the board when the previous carrier refused to renew the existing insurance policy. Mr. Stack testified that the change in carrier resulted in a decrease in property valuation.

¶ 46     The court also noted that the evidence established that mechanic's liens had been placed on the building for non-payment for prior work done by a contractor, CBR. Members of the Stack

Group testified that the liens were harming the property's value and would prevent the owners from selling their units.

¶ 47    Defendants did not dispute that liens previously existed but maintained that the liens had expired as a matter of law when CBR's suit was untimely brought.

¶ 48    The trial court considered the relevant provisions of the declaration and bylaws that related to the question of whether the owners' meetings were authorized. The trial court found that the owners' meetings were not properly conducted in the absence of a quorum where a majority of the board members were not present. The trial court rejected defendants' reliance on sections 18(a) and (b) of the Condominium Act as allowing a quorum to be satisfied based on a "weighted" measurement of ownership interest. The court also found that the evidence produced at the hearing required the appointment of a receiver. The court identified five reputable and competent receivers to assist the parties. The parties were allowed to select a receiver, and if they could not do so, the court would randomly select one of the five.

¶ 49                                    II. ANALYSIS

¶ 50    Defendants challenge the trial court's order granting plaintiffs' motion for the appointment of a receiver. Defendant also raises an interrelated challenge to the trial court's finding that defendant's "owners' meetings" were invalid when conducted in the absence of a quorum. Since the question of the legitimacy of these meetings is integral to our consideration of whether a receiver was required, we begin our discussion with a consideration of whether such meetings were authorized.

¶ 51       A. The Trial Court Properly Determined That the Association Meetings
Were Unauthorized Under the Terms of the Association's
Condominium Declaration and Bylaws

¶ 52                      1. Standard of Review

¶ 53    Defendants have failed to set out the standard of review to consider this particular claim. Supreme Court Rule 341(h)(3) (eff. Oct. 1, 2020) requires that "[t]he appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion in the argument."

¶ 54    In the absence of any suggestion as to the correct standard of review for this claimed error, we rely on the standard of review that applies to declaratory judgments since this was the relief sought by plaintiffs in their initial complaint and by defendants in their answer and counterclaim.

¶ 55    The appropriate standard of review to be applied to declaratory judgments depends on the underlying questions at issue and "the nature of the proceedings in the trial court." *Pekin Insurance Co. v. Hallmark Homes, L.L.C.*, 392 Ill. App. 3d 589, 593 (2009). When claimed errors are based on questions of fact, they are subject to a manifest weight of the evidence standard of review. *Kranzler v. Kranzler*, 2018 IL App (1st) 171169, ¶ 39. "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is arbitrary, unreasonable, and not based on the evidence." *In re G.W.*, 357 Ill. App. 3d 1058, 1059 (2005).

¶ 56    However, a pure question of law is subject to *de novo* review. *American States Insurance Co., v. Koloms*, 177 Ill. 2d 473, 480 (1997). Under a *de novo* standard of review, this court does

not defer to the lower court's judgment or reasoning but performs the same analysis that the lower court would perform. *Arthur v. Catour*, 216 Ill. 2d 72, 78 (2005).

¶ 57    In this case, the trial court's ruling followed a full-blown evidentiary hearing where extensive testimony was provided regarding the "owners' meetings" held by the Flamme Group and the actions taken at those meetings that affected the association as a whole. That being said, defendants do not appear to challenge the trial court's factual findings concerning the holding of these meetings and the actions taken at them. Instead, defendants argue that the trial court's ruling was wrong as a matter of law. Thus, where defendants allege that their "owners' meetings" and actions that were taken at those meetings were legally authorized under the terms of the association's condominium declaration, bylaws, and under the Condominium Act, we review this claim *de novo*.

¶ 58            2. *De Novo* Review of the Legitimacy of the "Owners' Meetings"

¶ 59    To resolve controversies involving the rights of condominium owners, we consider the declarations, bylaws, and any relevant provisions of the Condominium Act as a whole. *Stobe v. 842-848 West Bradley Place Condominium Ass'n*, 2016 IL App (1st) 141427, ¶ 13. The declaration is the contract between the association and the unit owners governing the operation of the condominium property and association and sets forth the board's duties related to the management of the property and association. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶¶ 70-75.

¶ 60    In construing a contract, the primary objective is to give effect to the intent of the parties. *1324 W. Pratt Condominium Ass'n v. Platt Const. Group, Inc.*, 2012 IL App (1st) 111474, ¶ 31.

When the words of the contract are clear, it should be enforced as written. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011); *Virginia Surety Co., Inc. v. Northern Ins. Company of New York*, 224 Ill. 2d 550, 556 (2007). In determining the intent of the parties, a court must consider the document as a whole and not focus on isolated portions of the document. *Palm*, 2014 IL App (1st) 111290, ¶ 75.

¶ 61 Here, in reviewing defendants' claim that their "owners' meetings" were authorized, the trial court found:

> "no authority for the so-called "Owners Meetings" in the Association[']s Declarations, Bylaws, or the Condo Act. The Association documents are clear that each of the six voting members of the Board are entitled to one vote, and four voting members are required to constitute a quorum. The owners meetings conducted by the Flamme Group were *ultra vires*. The Board is there for a reason, tasked with the responsibility of managing the affairs of the Association and acting in *all the Association members'* best interests. In conducting these Owners meetings, the Flamme Group was usurping the powers of the Board as outlined in the Declaration and Bylaws and was acting in their own self-interest and contrary to the interests of the Stack group. Such actions cannot continue." (Emphasis in original.)

¶ 62 Our review of the condominium declaration and bylaws leads us to the same conclusion as the trial court reached: defendants' 51.6% weighted ownership interest did not make them a legally constituted quorum such that they could take any action on behalf of the Association. We have previously outlined the relevant provisions of the declaration and bylaws. They uniformly establish

that board duties may only be undertaken when a properly constituted quorum is assembled and that a quorum is determined by a majority of unit owners, *i.e.*, four individual unit owners or their legal designees.

¶ 63     Neither the "special meetings" provision of Article V section 3(c) of the condominium declaration, nor Article I Section 3(b) of the bylaws enables any action to be taken at a special meeting unless authorized by the "board." Authorization of the "board" in turn requires a quorum. Again, under the plain terms of Article I Section 3(d) of the bylaws, "Fifty-one percent (51%) of the *voting members* shall be necessary to constitute a quorum at any meeting, annual or special." (Emphasis added.)

¶ 64     Next, we turn to defendants' claim that their actions were lawful based on the Condominium Act. Again, we agree with the trial court's rejection of this claim.

¶ 65     The purpose of the Condominium Act is to govern the affairs of Illinois condominium associations. *Royal Glen Condominium Ass'n v. S.T. Neswold and Associates, Inc.*, 2014 IL App (2d) 131311, ¶ 22. When the rights of an owner of a condominium are at issue, courts must harmonize the provisions of the Condominium Act with the association's bylaws and declaration, construing them as a whole. *Uehara v. Schlade*, 236 Ill. App. 3d 252, 260 (1992). Where a declaration is inconsistent with the Condominium Act, the Condominium Act prevails. *Palm*, 2014 IL App (1st) 111290, ¶ 129.

¶ 66     The written findings of the trial court clearly reflect its understanding and correct application of these principles:

"Defendants cite sections 18(a) and 18(b) of the Illinois Condominium Property Act, 765 ILCS 605/1 *et seq.* (the 'Condo Act') in support of their position with respect to the legitimacy of the Owners Meetings and matters voted upon therein. Section 18(a) speaks to minimum powers the Board must possess, and percentage voting is not one of them. Further, Section 18(b) speaks to what constitutes a quorum in voting. Unit owners have a higher percentage provided in the bylaws and amending bylaws to provide for a greater percentage for unit owners. However, there is nothing in the Association's Bylaws that so provides, and the Bylaws have not been amended to give more authority to unit owners having a greater percentage. In addition, Section 18(b)(2) provides 'that the association shall have one class of membership.' "

¶ 67    We find that the Condominium Act does not support defendants' claim. Section 18(b)(5) of the Condominium Act permits the calling of a special meeting by 20% of unit owners but does not grant them a coinciding right to assume the duties of the board. Section 18(b)(6) simply outlines the notice requirements if a special meeting is called. Finally, Section 18(b)(7) provides for voting on a percentage basis; however, it explicitly permits an association's bylaws to provide for voting to be "based on one vote per unit."

¶ 68    There is no conflict between the Act and the Association's condominium declaration and bylaws. That these documents provide no means of resolving a "tie" did not allow defendants to hold "owners meetings" based on a weighted majority to conduct board business that required a

properly constituted majority quorum. Nothing in the Condominium Act purports to "correct" an impasse created by an association's failure to provide a "tie-break" provision.

¶ 69    This, in turn, brings us to the ultimate question of whether a receiver was required to manage the Association.

¶ 70                    B. The Trial Court Properly Granted Plaintiffs' Motion
                            for Appointment of a Receiver

¶ 71    Defendants maintain that insufficient evidence supported the trial court's order granting plaintiffs' motion to appoint a receiver. Plaintiffs maintain that the trial court correctly ruled. We agree with plaintiffs.

¶ 72                              1. Standard of Review

¶ 73    The parties agree that the trial court's decision to appoint a receiver is reviewed for an abuse of discretion. In support of that proposition, defendants cite *City of Chicago v. Jewellery Tower, LLC*, 2021 IL App (1st) 201352, ¶ 45, while plaintiffs cite *Mendez v. Town of Cicero*, 2016 IL App (1st) 150791, ¶ 15.

¶ 74    *Mendez*, however, is inapposite where it does not involve the appointment of a receiver. While *Jewellery Tower* does involve the appointment of a receiver, the propriety of the appointment was not at issue. Instead, the case involves the propriety of the court's ruling on a motion to remove the receiver. 2021 IL App (1st) 201352, ¶ 42. Nothing in *Jewellery Tower* indicates that the initial appointment of the receiver was ever contested, no less the subject of an evidentiary hearing.

¶ 75    Where neither *Mendez* nor *Jewellery Tower* seems to us to be analogous to this case, we have considered additional authority: the court's decisions in *Bank of America, N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 165 (2010); *Forest Preserve District of Cook County v. Royalty Properties, LLC*, 2018 IL App (1st) 181323, ¶ 23, and *Dedic v. Board of North Shore Towers Condominium Association*, 2018 IL App (1st) 171842.

¶ 76    In *Bank of America,* the court noted that while a *de novo* standard of review applied in reviewing the appointment of a receiver when no findings of fact were made, "it is foreseeable that in a case in which a trial court has held a full evidentiary hearing on a motion to appoint a receiver, this court could find that an abuse of discretion standard or a manifest weight of the evidence standard would be appropriate to review the lower court's judgmental decision." *Bank of America*, 401 Ill. App. 3d at 165.

¶ 77    In *Forest Preserve District of Cook County*, the court considered defendants' claim that the trial court erroneously appointed a receiver to manage the property at issue. As in this case, the trial court held an evidentiary hearing and entered a detailed and extensive written order granting the appointment. *Forest Preserve District of Cook County*, 2018 IL App (1st) 181323, ¶ 12.

¶ 78    On appeal, the parties disagreed as to the appropriate standard of review. *Id.* ¶ 23. The court noted that when a trial court hears witness testimony and makes findings of facts, the reviewing court will generally afford deference to the trial court's superior position. *Id.* ¶ 23. The court determined that the trial court's factual findings should be reviewed under a manifest weight of the evidence standard of review while the ultimate question of the propriety of the receiver's appointment was reviewed *de novo*. *Id.*

¶ 79    In *Dedic*, the plaintiff sought *de novo* review of the trial court's denial of a permanent injunction. After conducting an evidentiary hearing, the trial court found that the deterioration of balconies at the property triggered the "emergency" exception to the requirement that unit owners vote on any special assessment to cover the cost of the repairs. *Dedic*, 2018 IL App (1st) 171842, ¶ 47. In discussing the applicable standard of review, the court held:

> "In these circumstances, our role is to determine whether the judge's
> findings are against the manifest weight of the evidence and whether the judge erred
> legally by denying injunctive relief." *Id.*

¶ 80    Based on our consideration of the previous cases, we find a bifurcated standard of review to be proper in this case. Thus, we consider whether the trial court's factual findings supporting the appointment of a receiver were manifestly erroneous and then review the propriety of appointing a receiver *de novo*. We note, however, that we would reach the same conclusion even if we were to apply an abuse of discretion standard of review.

¶ 81              2. The Trial Court's Findings of Fact Were Not Manifestly Erroneous

¶ 82    The trial court determined that a receiver was required based on the following factual findings:

> "That there is dissension and animosity between the parties in the present
> case is beyond question. The testimony and evidence put forth at the evidentiary
> hearing underscored the long-standing tension and enmity between the two groups
> and revealed an association in desperate need of the assistance of a receiver. There
> is presently no President or Vice President on the Board, no Association attorney

or regular accountant, and no property management company. It is unclear whether tax returns were filed for the past two years. The Flamme Group has essentially been running the building with their three votes on the theory that they have a majority, but as discussed above, there is nothing in the Declaration or Bylaws giving them the authority to do so. The Flamme Group has made numerous major decisions pertaining to the operation of the Association without proper Board approval. These decisions include, *inter alia*, hiring contractors, paying (or not paying) those contractors, obtaining insurance policies, and hiring and firing property managers and Association counsel.

Based on the above, the Court finds a receiver is necessary in this case. It is painfully evident the two groups are unable to cooperate enough to address the numerous pressing issues facing the Association – or any issues that may arise in the future, for that matter. Administration of the building is at a total stand-still. While basic bills such as trash and water are being paid and the building is still standing, not much more can be said. The building cannot continue to be managed by one group acting in their own self-interest and contrary to the Association Declaration and Bylaws. Despite the Court's efforts, the Board is at an impasse on practically every issue, and Board voting is and will continue to be deadlocked 3-3. The parties demonstrated they are totally unable to communicate effectively, and the Court cannot resolve every single squabble between the parties. A receiver

is the only way to move things forward and will provide the order and leadership

that the Association so desperately needs."

¶ 83    Defendants have failed to establish that the trial court's findings were manifestly erroneous. The testimony of the witnesses and the evidence presented at the hearing fully support the trial court's conclusion that the board was at an impasse on nearly all issues. Indeed, this impasse resulted in defendants deciding to take what they believed to be remedial actions by substituting board meetings with "owners' meetings."

¶ 84                3. The Trial Court Did Not Err When It Appointed a Receiver

¶ 85    Finally, we consider whether the trial court's order granting plaintiffs' motion for the appointment of a receiver was in error. "A trial court may appoint a receiver 'based on its equity jurisdiction, to secure and preserve property for the benefit of all concerned, so that the property might be subjected to such an order as the court might render.' " *Jewellery Tower,* 2021 IL App (1st) 201352, ¶ 47 (citing *Heritage Pullman Bank v. American Nat'l Bank & Trust Co. of Chicago*, 164 Ill. App. 3d 680, 687 (1987)).

¶ 86    Our *de novo* review of this final question leads us to the same legal conclusion reached by the trial court. That conclusion is well-reflected in the trial court's consideration of the applicable legal principles in determining that a receiver was required:

        "The appointment of a receiver resides in the arsenal of equitable remedies

        to be used when in the sound discretion of the chancellor it is needed to ensure

        complete justice is done between the parties. *Leib v. Toulin, Inc*., 113 Ill. App. 3d

        707, 718 (1st Dist. 1983). It is a harsh remedy, however, and should not be exercised

doubtingly, but only after the court has been convinced such remedy is absolutely necessary to prevent irreparable losses. *Id.* at 718-19. The standards by which the appointment of a receiver can be justified are exceptionally stringent. *Prassas v. Nicholas W. Prassas & Co.*, 102 Ill. App. 3d 319, 321 (1st Dist. 1981). A receiver is appropriate only when dissension, fraud, misconduct, or mismanagement exist which make it impossible for the business to continue or to preserve its assets. *Id.* (citing *Bagdonas v. Liberty Land & Inv. Co.*, 309 Ill. 103, 110 (1923). Mere [dissension] and dispute between the parties does not justify so drastic a remedy. *Schroeder v. Meier-Templeton Assocs., Inc.,* 130 Ill. App. 3d 554, 561 (5th Dist. 1984).

Importantly, '[c]ourts do not appoint receivers as a punishment for past dereliction, nor because of past dangers.' *Jackson v. Metro Funeral Sys. Ass'n*, 268 Ill. App. 302, 310 (1st Dist. 1932). Receivers are appointed because of present conditions and well-founded apprehensions as to the future. *Id.* Past conduct and past conditions may be taken into consideration in determining what the present situation is and the future will be, but a receiver will not be appointed because of things done or attempted at a past time, when the present situation and the prospects for the future are not such as to warrant taking the control of the property out of the hands of its owners. *Id.*"

¶ 87    Not only did the trial court's written order reflect a correct understanding of the applicable law, but, additionally, during these proceedings, the trial court specifically remarked, "[i]n order to have a receiver you need sort of a crisis-level situation or endangerment."

¶ 88    We find that the evidence adduced at the evidentiary hearing showed a "crisis-level situation" and "endangerment" to the association as a whole. Despite repeated attempts to overcome the stalemate, the parties could not overcome their differences and establish a functioning board that could assume the responsibilities spelled out in the condominium declaration. The lack of a "tie-breaker" provision in the declaration or bylaws meant that the situation was incapable of being rectified, short of the necessary quorum of four being reached. The record contains no support for the notion that this was a realistic possibility given the entrenched position of the parties.

¶ 89    Our decision is not altered by those cases relied on by defendants, *Citicorp Sav. Of Illinois, F.A. v. Occhipinti*, 136 Ill. App. 3d 835 (1985); *Leib v. Toulin, Inc.*, 113 Ill. App 3d 707 (1983); *Prassas v. Nicholas W. Prassas & Co*, 102 Ill. App. 3d 319 (1982); or *Poulakidas v. Charalidis*, 68 Ill. App. 3d 610 (1979), where none of these cases are factually apposite.

¶ 90    In *Occhipinti*, the plaintiff successfully moved for the appointment of a receiver for real estate that was the subject of a pending mortgage foreclosure proceeding. The appellate court found that evidence from the hearing provided no "basis to believe that the subject premises might suffer damage due to a discontinuation of water, heat, refuse collection or maintenance." *Occhipinti*, 136 Ill. App. 3d at 840. Nor did the trial court's concern about the defendant's failure

to make contributions toward an assessment provide a basis for the appointment where the potentially affected third parties were not involved in the litigation. *Id.* at 841.

¶ 91    In *Leib*, the appellate court held that the appointment of a receiver was in error where the plaintiffs presented no evidence to support their allegations of fraud or mismanagement. *Leib*, 113 Ill. App. 3d at 719. Plaintiff's concern that assets would be impaired at some future time was speculative. *Id.* at 719-20.

¶ 92    Also, in contrast to the case at bar, in *Leib*, there was only the possibility that the building manager would resign, and the possibility of mechanic's liens being placed on the property. *Id.* at 720. The appellate court found that "here a resolution of the issues raised in Leib's complaint plus the issuance of an injunction requiring the parties to cooperate with the manager of the building, once Leib's injunction claim is decided, would appear to be adequate." *Id.*

¶ 93    In *Prassas*, the underlying action involved a dispute involving commercial properties, including a shopping center, in which both parties had an interest. Plaintiffs brought an action to enjoin defendants from making expenditures on those properties without plaintiffs' prior written approval. *Prassas*,102 Ill. App. 3d at 319. Plaintiffs successfully sought the appointment of a receiver to manage the properties during the pendency of the action. *Id.* at 320.

¶ 94    The appellate court found that plaintiffs failed to present evidence to indicate that the assets were in jeopardy. *Id.* at 321-22. The evidence showed that the shopping center was operating at a profit and that the possibility of a sale of the shopping center was insufficient to warrant the appointment of a receiver. *Id.*

¶ 95    *Poulakidas* arose from an action for an accounting and dissolution of a partnership operating a restaurant business. A receiver was appointed to manage the restaurant's financial affairs. *Poulakidas*, 68 Ill. App. 3d at 611. The appellate court found no evidence of fraud or imminent danger of dissipation or loss to the business assets to support the appointment. *Id.* at 614. The court concluded that the trial court erred in appointing a receiver where the dispute between the parties could be adequately resolved by an accounting rather than the appointment of a receiver. *Id.* at 615.

¶ 96    The instant case does not involve "mere dissension and dispute" between the parties, but a present danger to the owners' interests and an imminent threat to their assets. In conclusion, the evidence adduced at the hearing fully supported the trial court's order granting plaintiffs' motion for the appointment of a receiver.

¶ 97                                   III. CONCLUSION

¶ 98    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 99    Affirmed.